```
                                          ┌─────────────────────────────────┐
                                          │ USDC SDNY                        │
                                          │ DOCUMENT                         │
                                          │ ELECTRONICALLY FILED             │
                                          │ DOC #:_____                   │
UNITED STATES DISTRICT COURT              │ DATE FILED: 1/12/16              │
SOUTHERN DISTRICT OF NEW YORK             └─────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                                                  :
DANIEL SHAK and SHK DIVERSIFIED, LLC                              :
(and/or their successors in interest),                            :
                                                                  :
                                          Plaintiffs,             :          15 Civ. 992 (PAE)
                                                                  :
                    -v-                                           :
                                                                  :
JPMORGAN CHASE & CO. et al.,                                      :
                                                                  :
                                          Defendants.             :
------------------------------------------------------------------X
THOMAS WACKER,                                                    :
                                                                  :
                                          Plaintiff,              :          15 Civ. 994 (PAE)
                                                                  :
                    -v-                                           :
                                                                  :
JPMORGAN CHASE & CO. et al.,                                      :
                                                                  :
                                          Defendants.             :
------------------------------------------------------------------X
MARK GRUMET,                                                      :
                                                                  :
                                          Plaintiff,              :          15 Civ. 995 (PAE)
                                                                  :
                    -v-                                           :          OPINION & ORDER
                                                                  :
JPMORGAN CHASE & CO. et al.,                                      :
                                                                  :
                                          Defendants.             :
------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

These cases involve allegations of market manipulation in a commodities derivatives

market, specifically, the market in silver futures calendar spreads.  Plaintiffs, sophisticated

individual commodities traders, allege that defendants (collectively, "JP Morgan") manipulated

the settlement prices in this market to benefit their positions, primarily by placing large, uneconomic orders at the close of trading.  JP Morgan has moved to dismiss.  For the reasons that follow, the Court grants the motion to dismiss, with leave to replead plaintiffs' antitrust claims but not any others.

## I.    Background[1]

### A.    Parties

The complaints in these three cases, brought by a common counsel, make parallel allegations against common defendants.  The complaints differ only in certain descriptive and mostly irrelevant details, like the precise timing of each plaintiff's trades and hence his (or its) alleged injuries.  The Court accordingly consolidated the briefing for the purpose of resolving the instant motions to dismiss.

One action, 15 Civ. 992, originated with a complaint filed in state court on January 22, 2015 by plaintiffs Daniel Shak, SHK Asset Management, and SHK Diversified, LLC.[2]  Shak Dkt. 1, ¶ 1.  Shak is a metals trader focused on "spread trading in silver and gold futures spread contracts," and is the principal of the two corporate entities.  Shak Compl. ¶¶ 14–15; Shak Dkt. 1.  These parties are hereinafter referred to as "the Shak plaintiffs."

---

[1] The Court assumes the facts alleged in the complaints to be true for the purpose of resolving the motions to dismiss.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  When necessary, the Court distinguishes between the three actions by placing the relevant plaintiff's name before referring to docket numbers or documents, *e.g.*, "Shak Dkt. 1" or "Grumet Compl." Where the allegations are essentially common to all three sets of plaintiffs, the Court will refer only to the Shak complaint.

[2] After removal, a new complaint was filed in this Court naming only Shak and SHK Diversified, LLC as plaintiffs.  *See* Shak Dkt. 14 ("Shak Compl."), ¶¶ 14–15.

A second action, 15 Civ. 994, originated with a state court complaint filed on February 4, 2015 by plaintiff Thomas Wacker.  Wacker Dkt. 1, ¶ 1.  Wacker, a silver and gold futures trader who is self-financed, trades from home.  Wacker Dkt. 14 ("Wacker Compl."), ¶¶ 14–15.

A third action, 15 Civ. 995, began with a state court complaint filed on February 5, 2015 by plaintiff Mark Grumet.  Grumet Dkt. 1, ¶ 1.  Grumet has decades of experience in the commodities market; for more than two decades, he has traded silver and other commodity futures contracts for his own account.  Grumet Dkt. 13 ("Grumet Compl."), ¶ 15.

The defendants in each action are J.P. Morgan Chase & Co., J.P. Morgan Clearing Corp., J.P. Morgan Securities LLC, and J.P. Morgan Futures, Inc. (which has since merged into J.P. Morgan Securities LLC).  *See, e.g.*, Shak Compl. ¶¶ 16–19.  These defendants will be referred to collectively as "JP Morgan."

### B.      Facts

In short, plaintiffs allege that JP Morgan manipulated and dominated what they term the "silver futures spread market and in particular the 'long-dated' silver futures spread market" in late 2010 and early 2011.  *See id.* ¶ 52.

### 1.      The Silver Futures Calendar Spread Market

Silver futures contracts are agreements to buy or sell fixed amounts of silver on a certain future date.  *Id.* ¶ 23.  They are traded on the Commodity Exchange, Inc. ("COMEX"), which provides standardized contracts with delivery dates ranging from the next calendar month to 60 months later.  *Id.* ¶ 22.  The prices for "deferred" futures contracts—those with delivery dates beyond the most nearby month—are determined by a variety of factors; in the absence of trading activity on which to base the prices, the COMEX "settlement committee" uses "the spread bids/asks actively represented" in the marketplace, *i.e.*, the prices at which contracts are being offered.  *Id.* ¶ 25.  Typically, the further off the delivery date, the greater the purchase price of

the futures contract for that date—a relationship called "contango." *Id.* ¶ 35. A relationship of "backwardation"—where nearer deliveries of the commodity cost more—is "extremely rare" in the silver futures market. *Id.* ¶¶ 36–37.

A spread contract consists of alternating positions in two futures contracts. *Id.* ¶ 28. In a "long" calendar spread, a party purchases a futures contract in a particular month and sells a corresponding contract in a later month. *Id.* In a "short" calendar spread, a party sells a futures contract in a particular month and purchases a corresponding contract in a later month. *Id.* The spreads between silver futures contracts on a particular day are indicators of the "interest rate term structures of silver prices on that day." *Id.* ¶ 30. The pricing of calendar spreads also often helps determine the pricing of deferred futures contracts. *Id.*

### 2.     JP Morgan's Alleged Conduct

During the period at issue in this case—late 2010 and early 2011—JP Morgan was one of only two or three remaining market makers in the silver futures markets. *Id.* ¶ 49. Thus, the market for deferred silver futures calendar spreads "essentially consisted of JPMorgan on one side and a small number of lower capitalized and very vulnerable locals and other independent proprietary traders acting as market makers on the other." *Id.* ¶ 51. The plaintiffs were such traders. *Id.*; Wacker Compl. ¶ 51; Grumet Compl. ¶ 51. During this time, JP Morgan's silver trading desk was controlled by Robert Gottlieb, who used various COMEX floor brokers to execute his orders. Shak Compl. ¶ 55.

Plaintiffs allege that JP Morgan manipulated the silver futures spread market by taking large long positions in nearby silver futures months against short positions in the deferred futures months, *id.* ¶ 57, and then placing "large, uneconomic spread bids and offers . . . just prior to the close," *id.* ¶ 67. These spread orders, plaintiffs allege, influenced the settlement prices in deferred futures contracts, determined by the settlement committee. *Id.* This pushed the spreads

toward the rare condition of "backwardation," benefitting JP Morgan's position.  *Id.*  During the same period, Gottlieb also allegedly caused certain brokers to "harangue" COMEX employees, by pointing to JP Morgan's own uneconomic bids and offers, so as to obtain JP Morgan's desired settlement spreads.  *Id.* ¶ 73.

This allegedly artificial market movement put pressure on plaintiffs' positions, which they were ultimately forced to liquidate.  *Id.* ¶¶ 76–77.  JP Morgan itself took some of the Shak plaintiffs' silver spread positions, while a hedge fund with "significant links" to JP Morgan, Wolverine Asset Management LLC, took most.  *Id.* ¶¶ 78–79.  These transfers took place on January 24, 2011.  *Id.* ¶ 80.  Similarly, Wacker and Grumet allege that, when they were ultimately forced to liquidate a few weeks later, JP Morgan was "clearly the counterparty." Wacker Compl. ¶ 80; Grumet Compl. ¶ 80.  Wacker's liquidation primarily took place on three dates (January 25, February 3, and February 7, 2011, *see* Wacker Compl. ¶ 93)[3], while Grumet's primarily occurred on February 17, 2011, *see* Grumet Compl. ¶ 76.[4]

Plaintiffs articulate several reasons to believe JP Morgan engaged in such conduct.  First, they allege that JP Morgan was motivated to manipulate the silver spreads market.  They allege that manipulating the spreads benefitted JP Morgan "in the context of physical transactions with its silver counterparties, which were based on COMEX silver futures price settlements."  Shak Compl. ¶ 98.  They further allege that the manipulation improved JP Morgan's traders' "marked-to-market" positions.  *Id.* ¶ 99.

---

[3] The trades spanned January 7, 2011 to February 25, 2011.  Wacker Compl. ¶ 91.

[4] Some trades occurred as early as January 5, 2011, and as late as February 22, 2011.  Grumet Compl. ¶ 88.

Second, plaintiffs allege that "open interest" (the total number of futures in a delivery month that have not been offset or fulfilled by delivery) and "volume" (the number of contracts in futures transacted during a specific period of time) evidence JP Morgan's manipulation. *See id.* ¶¶ 31–32. Plaintiffs allege that "JP Morgan's market power is demonstrated by the high percentage of open interest it comprised in the deferred spreads" and "by the percentage of total volume JP Morgan's [sic] commanded on particular trading days." *Id.* ¶ 58. For instance, on certain of the dates that Wacker and Grumet sold their positions to JP Morgan, those trades accounted for 19%, 94%, 84%, and 70% of the daily volume, and the open interest in the particular calendar spreads was reduced by roughly the amount of the trades, showing, plaintiffs claim, that JP Morgan was the counterparty. *Id.* ¶¶ 60–61; *see also* ¶ 80 (as to Shak liquidation).

Third, plaintiffs allege that there was systematic, anomalous divergence between the silver spreads market and the over-the-counter (OTC) silver market, which should roughly track one another, absent manipulation. *See id.* ¶¶ 102–118. The silver OTC market "consists generally of bi-lateral contracts between parties for various sorts of silvers swaps and other derivatives." *Id.* ¶ 38. Like the spreads market, plaintiffs allege, the silver OTC market "is driven largely by interest rate mechanics." *Id.* ¶ 40. Until late 2012, the Silver Indicative Forward Mid Rates ("SIFO") was a "reliable benchmark" representing conditions in the OTC market. *Id.* ¶ 44. Prior to January 2011, plaintiffs allege based on an expert consultant's analysis, SIFO and the silver futures spreads "were close to each other." *Id.* ¶ 110. A "significant divergence" occurred between January and May 2011 (*i.e.*, beginning around the time of JP Morgan's alleged conduct), which, plaintiffs claim, is "potentially a sign of silver futures settlements being manipulated throughout the period." *Id.* Specifically, during this time period, silver futures spreads diverged from SIFO by an average of "10 to 15 cents." *Id.* ¶ 131.

Because they converged again in May 2011, plaintiffs' expert concluded, the divergence was not "due to a fundamental structural change in the silver market." *Id.* ¶ 129.  And because the divergence lasted several months, the expert concluded it was not due to the arrival of new information, which would be quickly absorbed by the market.[5]  *Id.* ¶ 130.  The expert also looked at JP Morgan's SIFO submissions and found that, while they were in line with the futures spreads before January 2011, from January 2011 on, there was "a clear divergence between silver futures spreads and JP Morgan's SIFO submissions." *Id.* ¶ 189.  Plaintiffs allege that this explains "why futures spreads entered backwardation to such an extent while SIFO did not." *Id.* ¶ 196.

## C.    Procedural History

As noted, plaintiffs initiated these actions by filing complaints in early 2015:  Shak on January 22, 2015; Wacker on February 4, 2015; and Grumet on February 5, 2015.  *See* Shak Dkt. 1, ¶ 1; Wacker Dkt. 1, ¶ 1; Grumet Dkt. 1, ¶ 1.  On February 11, 2015, JP Morgan removed each case to federal court.  On March 10, 2015, at the parties' request, *see* Shak Dkt. 10, the latter two actions were assigned to this Court as related to the first-filed Shak Action, with the consent of the other judges and the District's case assignment committee.  *See* Shak Dkt. 11.

---

[5] The Amended Complaints allege that other analyses performed by plaintiffs' expert yielded the same conclusions.  The expert performed a regression analysis that concluded that the relationship between silver futures spreads and SIFO decreased significantly in early 2011, but bounced back gradually starting in May 2011.  *See id.* ¶¶ 132–53.  A separate analysis concluded that the likelihood of "structural breaks" in the relationship between silver futures spreads and SIFO was greatest in early 2011, which the expert concluded, was not due to the arrival of new information (as the break lasted many months, *id.* ¶ 165) or a fundamental change in the market (as the relationship normalized after May 2011, *id.* ¶ 166).  *See id.* ¶¶ 154–166.  Yet another analysis of "autoregressive models" concluded that the divergence was "highly anomalous" and "potentially indicative of a consistent manipulation in the December silver futures settlements for at least from Jan 2011 to May 2011." *Id.* ¶ 167.  Finally, an analysis comparing various silver forward points to the silver futures spreads at issue showed that December silver futures behaved differently from the rest of the market, potentially a sign of manipulation.  *See id.* ¶ 174; 183.

On April 20, 2015, plaintiffs filed complaints in this Court.  Shak Dkt. 14; Wacker Dkt. 14; Grumet Dkt. 13.  Each brought seven claims:  (1) three claims under the Commodities Exchange Act ("CEA"), 7 U.S.C. §§ 1, *et seq*., to wit, a claim of price manipulation in violation of 7 U.S.C. § 13(a)(2) and § 25(a), *see* Shak Compl. ¶¶ 201–02; a claim of manipulation by fraud and deceit in violation of 7 U.S.C. § 9 and § 25, *see id.* ¶ 210; and a claim of principal-agent liability under 7 U.S.C. § 2(a)(1)(B), *see id.* ¶ 217; (2) one claim under Section 2 of the Sherman Act, 15 U.S.C. § 2, alleging monopolization, conspiracy to monopolize, and attempt to monopolize, *see id.* ¶¶ 220–21; (3) one claim under New York General Business Law (NYGBL) § 340 (the Donnelly Act), alleging monopolization, *see id.* ¶ 232; (4) one claim under NYGBL § 349 alleging deceptive acts in the conduct of business, *see id.* ¶ 238; and (5) a state common-law claim for unjust enrichment, *see id.* ¶ 243.

On June 19, 2015, JP Morgan moved to dismiss all three complaints.  Shak Dkt. 21.  JP Morgan submitted a memorandum of law in support of these motions, Shak Dkt. 22 ("Def. Br."), as well as a declaration of Amanda F. Davidoff, Shak Dkt. 23 ("Davidoff Decl."), with attached exhibits.  On August 18, 2015, plaintiffs filed a common memorandum of law in opposition. Shak Dkt. 28 ("Pl. Br.").  On September 17, 2015, JP Morgan filed a reply brief.  Shak Dkt. 34 ("Def. Reply Br.").  On November 10, 2015, the Court held argument.  Shak Dkt. 41 ("Tr.").

## II.    Legal Standards on a Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."[6] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim has "facial plausibility when the plaintiff pleads factual content that

---

[6] The parties dispute whether the CEA claims must be pled with particularity under Fed R. Civ. P. 9(b), but because the Court dismisses these claims as time-barred, *see infra*, it need not reach that issue.

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

In considering a motion to dismiss, a district court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010)) (internal quotation marks omitted).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.  "[R]ather, the complaint's *factual* allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 570) (internal quotation marks omitted) (emphasis in *Arista Records*).

## III. Discussion

### A. Statutes of Limitations

The Court examines first whether plaintiffs' claims are timely.  For each plaintiff, nearly four years passed between the day in early 2011 when the plaintiff's position was liquidated (and when the plaintiff claims to have suffered an injury caused by JP Morgan) and the day in early 2015 when the plaintiff filed his complaint.  Because plaintiffs' claims are subject to different statutes of limitations, the Court examines each cause of action separately.

### 1.      CEA Claims

CEA claims are subject to a two-year statute of limitations.  7 U.S.C. § 25(c).  Plaintiffs make three arguments as to why their CEA claims are nonetheless timely—that: (1) the claims did not arise in early 2011, but at an unspecified later date; (2) the pendency of a related class action tolled the statute of limitations, and (3) the related class action ended, and the limitations clock began to run as to plaintiffs, not in December 2012, when a motion to dismiss the class action was granted, but in March 2013, when leave to replead was denied.  For plaintiffs' CEA claims to be timely, plaintiffs would be required to prevail on at least the second and third arguments, in which event the two-year statute of limitations would not have expired until March 2015, *i.e.*, some two months after they filed their complaints.  In fact, none of plaintiffs' arguments has merit.

### a.      When did plaintiffs' CEA claims arise?

Plaintiffs argue that their CEA claims did not arise in early 2011—at the time they were allegedly injured by the forced liquidation of their positions—but at an unspecified later date.

Under the CEA, the two-year statute of limitations begins to run upon "discovery of the injury, not discovery of the other elements of a claim."  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 697 (S.D.N.Y. 2013) (quoting *Koch*, 699 F.3d at 148–49) (internal quotation marks omitted).  A plaintiff's knowledge of the injury may be imputed in situations where the plaintiff had a duty of inquiry; the date on which such knowledge is imputed to the plaintiff turns on whether and how the plaintiff discharged that duty.  *See id.* at 698.

The duty of inquiry arises when "circumstances would have suggested to a person of ordinary intelligence the probability that he had been defrauded."  *Id.*  If the plaintiff thereupon proceeds to make no inquiry, knowledge of the injury is imputed at the time the duty arose, and the limitations period begins at that point.  *See id.*  If, however, the plaintiff makes an inquiry,

the limitations period starts to run from the date that a reasonably diligent inquiry should have revealed the fraud.  *See id.*

Courts have characterized defendants as bearing a "heavy burden" on this point, because inquiry notice "exists only when uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered" the fraudulent conduct.  *In re Crude Oil Commodity Futures Litig. ("In re Crude Oil")*, 913 F. Supp. 2d 41, 59 (S.D.N.Y. 2012) (quoting *Newman v. Warnaco Grp., Inc.*, 335 F.3d 187, 194–95 (2d Cir. 2003)).  Dismissing claims on statute of limitations grounds at the complaint stage "is appropriate only if a complaint clearly shows the claim is out of time."  *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999).

Here, plaintiffs argue that "at the time Plaintiffs liquidated their positions, they were not fully aware of the fact that JP Morgan was entirely on the opposite side of their contracts," and that the "smattering of publicly available information" was insufficient to trigger a duty of inquiry.  Pl. Br. 16 (citing *Koch*, 699 F.3d at 149, for proposition that the clock "does not run until a plaintiff discovers 'the injury *and the injurer*'" (emphasis in brief)).  But that argument is undermined by the allegations in plaintiffs' complaints.[7]  These unavoidably suggest, if not outright assert, that in early 2011, plaintiffs were well aware—and in any event easily could have learned through publicly available data—that JP Morgan was their counterparty.  *See* Shak Compl. ¶ 80 ("That JP Morgan was on the other size [sic] of Plaintiffs [sic] short spread positions is corroborated by what happened to open interest for many of the positions that JP actually did take over."[8]); *id.* ¶ 8 (the Shak plaintiffs' Futures Commission Merchant called JP

---

[7] It is also half-hearted:  Plaintiffs' statement that they were "not fully aware" of JP Morgan's role as their counterparty tacitly admits that plaintiffs had some awareness of this point.

[8] The pleadings do not state when open interest for a trading day is known—on the date itself, or later.  At argument, JP Morgan's counsel represented, without contradiction, that open interest is available in "realtime."  Tr. 6.  The Court's holding that plaintiffs' CEA claims arose at the time

Morgan's head of global commodities to "sue[] for peace" and told her that Gottlieb was "running Daniel Shak in"); *see also* Wacker Compl. ¶¶ 76, 80; Grumet Compl. ¶¶ 80–81.  And plaintiffs' counsel, to his credit, conceded at argument that the complaints suggested that his clients were aware in real time of JP Morgan's role.  *See* Tr. 32–33.  Tracking allegations in the complaints, plaintiffs' counsel further acknowledged that "people on the floor" were contemporaneously aware of JP Morgan's alleged pre-closing bids—the injury-causing conduct at the heart of plaintiffs' claims.  Tr. 34; *see* Shak Compl. ¶ 59 ("JP Morgan's positions also can be adduced in part through its conduct on the floor . . . ."); *see also* Wacker Compl. ¶ 56; Grumet Compl. ¶ 56.  These allegations bar any argument that, when plaintiffs were forced to close their positions in early 2011, they were unaware that the party forcing their hand was JP Morgan.

The Court accordingly holds that plaintiffs' duty of inquiry arose at the point when their positions were liquidated and they suffered an injury caused by the conduct of counterparty JP Morgan.  Plaintiffs point to no inquiry that they subsequently undertook.  The limitations period as to each plaintiff's CEA claims therefore arose and began to run when he liquidated his positions: on January 24, 2011 for the Shak plaintiffs; between January 7, 2011 and February 25, 2011 for Wacker; and between January 5, 2011 and February 22, 2011 for Grumet.  *See* Shak Compl. ¶¶ 78–79; Wacker Compl. ¶ 91; Grumet Compl. ¶ 88.[9]  These dates predate the filing of the respective complaints by about four years.

---

their positions were liquidated does not turn on this fact, because it is independently supported by plaintiffs' awareness of JP Morgan's conduct on the trading floor.

[9] Unlike the Shak plaintiffs, Wacker and Grumet allege that they liquidated their positions over the course of many weeks in early 2011.

> b.      *Was the statute of limitations ever tolled?*

Plaintiffs, relying on the tolling doctrine announced in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), next argue that the CEA statute of limitations was tolled by the pendency of a related class action.  They point to a class action bringing CEA and antitrust claims against the same four JP Morgan defendants involved here for alleged manipulation of "COMEX silver futures and options contracts."  *In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.* ("*Silver Class Action I*"), No. 11 MD 2213 (RPP), 2012 WL 6700236, at *4 (S.D.N.Y. Dec. 21, 2012).  This argument, however, does not withstand close analysis.

The first complaint in what would become the Silver Class Action was filed on October 27, 2010.  *See Beatty v. JP Morgan Chase & Co.*, 10 Civ. 8146, Dkt. 1.  A consolidated class action complaint was filed on September 12, 2011.  *Silver Class Action I*, 2012 WL 6700236, at *1.  Defendants' motion to dismiss was granted on December 21, 2012, *see id.*, whereupon the district court gave plaintiffs 30 days "to show why leave to replead is necessary," *id.* at *22. Leave to replead was denied on March 18, 2013.  *In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.* ("*Silver Class Action II*"), No. 11 MD 2213 (RPP), 2013 WL 1100770, at *1 (S.D.N.Y. Mar. 18, 2013), *aff'd*, 560 F. App'x 84 (2d Cir. 2014) (summary order).  Plaintiffs argue that the statute of limitations was tolled between October 27, 2010 and March 18, 2013, such that the clock did not even begin to run on their claims until less than two years before they filed their complaints.

Under *American Pipe*, "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action."  414 U.S. at 554.  However, to qualify for such tolling, a later individual action must challenge the same conduct as the class action, such that the class action is "sufficient to alert the defendants sued there to preserve the evidence regarding

13

that conduct" and "the relevant evidence, memories, and witnesses . . . are the same for both actions." *Cullen v. Margiotta*, 811 F.2d 698, 720–21 (2d Cir. 1987), *overruled on other grounds by Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143 (1987).  In other words, the statute of limitations is not tolled if the individual action "raises a new *factual* theory."  *In re Libor-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 (NRB), 2015 WL 4634541, at *135 (S.D.N.Y. Aug. 4, 2015) (emphasis in original).

It appears to be undisputed that plaintiffs were members of the class in the Silver Class Action.  Pl. Br. 14.  However, JP Morgan argues, the complaints here are based on alleged misconduct that is distinct from that alleged in the Silver Class Action.  In particular, JP Morgan notes that (1) the class period predated the conduct at issue here; (2) the two cases "involved different trading positions," *i.e.*, short positions in nearby futures in the Silver Class Action, versus long positions in nearby futures in this case; and (3) the Silver Class Action involved alleged manipulation of silver futures and options, whereas plaintiffs here allege manipulation of calendar spreads.  Def. Reply Br. 2–3.

Plaintiffs agree that the conduct involved in this case occurred in "different months" than the conduct underlying the Silver Class Action.  Pl. Br. 14 n.8.  However, plaintiffs argue that the conduct at issue in the two cases occurred during the "same general time frame."  *See id.* (quoting *Sharpe v. Am. Exp. Co.*, 689 F. Supp. 294, 301 (S.D.N.Y. 1988)); *see also* Tr. 37 (plaintiffs' counsel acknowledging that "there was no trade [in this case] that was done from start to finish during the [class action] period").  Specifically, the Silver Class Action challenged conduct alleged to have occurred on June 26, 2007 and also between March 17, 2008 and October 27, 2010.  *Silver Class Action I*, 2012 WL 6700236, at *1.

In arguing that alleged conduct in the "same general time frame" is close enough for tolling purposes, plaintiffs rely on a case that involved discriminatory conduct that was ongoing but that reached back in time enough to overlap with conduct covered by the prior class action. *See Sharpe*, 689 F. Supp. at 301–02.  Here, by contrast, none of the conduct alleged in these individual lawsuits appears to have occurred within the class period of the Silver Class Action. Moreover, notwithstanding the class end date of October 27, 2010, Judge Patterson's decision dismissing the Silver Class Action referred to dates no later than August 2010, and the bulk of the conduct at issue was alleged to have occurred in 2007 and 2008.  *See Silver Class Action I*, 2012 WL 6700236, at *5–7.  Thus, the conduct alleged here, in late 2010 and early 2011, came years after most of the conduct alleged in the class action occurred, and appears to have postdated all of the conduct on which the class case was based.  Plaintiffs allegedly injured by conduct beginning so long after the conduct at issue in the class action could not have reasonably relied on that class action to represent their interests as to the post-class conduct.

Moreover, the substantive differences between claimed illegalities in the Silver Class Action and those alleged here are significant, so as to clearly not trigger the rationale behind *American Pipe*.  *American Pipe* tolling is based on the notion that, when a later individual suit "concern[s] the same evidence, memories, and witnesses as the subject matter of the original class suit," defendants cannot claim unfair surprise when they are subjected to the subsequent suit, even if the statute of limitations, absent tolling, would have otherwise barred it.  *American Pipe*, 414 U.S. at 562 (Blackmun, J., concurring).  Here, in light of the different types and timing of the acts of market manipulation alleged, there is no basis to suppose that the two actions would turn on the "same evidence, memories, and witnesses."  While one JP Morgan trader, Gottlieb, is mentioned in the complaints in both cases, tellingly absent from the Silver Class

Action complaint are any accusations of face-to-face manipulation of the COMEX settlement committee, which the instant complaints prominently feature.[10]  *See, e.g.*, Shak Compl. ¶¶ 73–74. Plaintiffs' counsel speculated at argument that had the Silver Class Action proceeded to discovery and had Gottlieb been deposed, evidence of his manipulation of calendar spreads as alleged in this case might have come to light.  Tr. 39–40.  But this is sheer speculation.  And the pertinent point is that, whether or not later and different machinations by Gottlieb might have been revealed, these were not the basis of the class action.

To be sure, while some allegations in the present case (*e.g.*, the claim that JP Morgan caused brokers to "harangue" the settlement committee to achieve its desired settlement prices, *see* Shak Compl. ¶ 73) appear to be unique, there are some echoes or similarities between the theories of misconduct underlying this case and the prior class action.  The class action involved accusations that JP Morgan "placed . . . large volume (spoof) sell orders for silver futures just above the price at which the market was trading," which "deceptively encouraged other traders to sell futures in the belief that the market was going to trade lower."  *Silver Class Action* Compl. ¶ 56.  Here, too, plaintiffs allege a form of market manipulation: that JP Morgan placed uneconomic bids and offers at the close of trading in order to squeeze other market players.  But this thematic similarity—the common claim of a form of price manipulation—is insufficient to create the requisite overlap between the two cases.  As plaintiffs acknowledge, the Silver Class Action "did not allege that JP Morgan was banging the close [*i.e.*, placing large orders at the

---

[10] The class action complaint also mentions JP Morgan traders Marcus Elias and Chris Jordan, *see* 11 Md. 2213, Dkt. 85 ("*Silver Class Action* Compl."), ¶ 58.  These persons are unmentioned in the Shak, Wacker, and Grumet complaints.

close of trading] to benefit its own trading position," Pl. Br. 28 n.20, which is the core allegation here.

The *American Pipe* requirement that the individual and class actions have involved essentially the same conduct is unsatisfied when defendants in the two cases are alleged to have engaged in similarly malodorous, but clearly factually different, forms of manipulation.  Because the conduct alleged in the individual and class actions took place at different times and involved different trading positions, different derivatives, and significantly non-overlapping conduct, the fact that plaintiffs in both cases alleged forms of wrongful price manipulation by defendants is insufficient to trigger *American Pipe* tolling.

> c.    *When did the prior class action end?*

Even if the class action *did* toll the statute of limitations, plaintiffs' theory that the toll extended until March 2013 does not follow.  The class action ended—and thus the statute of limitations, assuming *American Pipe* tolling up to that point, began to run—on December 21, 2012, when Judge Patterson dismissed the Silver Class Action.  *Silver Class Action I*, 2012 WL 6700236.  That was more than two years before any complaints were filed in this case.

Plaintiffs' argument that the opportunity that Judge Patterson extended to move for leave to replead meant that tolling continued after the case was dismissed is unavailing.  It is well settled that "dismissal of all class claims in a suit terminates tolling and causes the limitations period for each absent class member to resume running."  *Scott v. D.C.*, 87 F. Supp. 3d 291, 296 (D.D.C. 2015).  In *Scott*, tolling was held to continue through an initial dismissal of class claims because the class action complaint was dismissed with specific leave to amend certain class claims.  *See id.* at 298.  Here, in contrast, no such leave to amend was granted, and Judge Patterson expressed substantial doubt about whether it would be.  *See Silver Class Action I*, 2012

WL 6700236, at *22 ("[I]t is not clear that justice so requires leave to amend the Complaint at issue.").

Under these circumstances, after December 21, 2012, plaintiffs' "reliance on the class action to advance their claims" would have been unreasonable. *In re Initial Pub. Offering Sec. Litig.*, 617 F. Supp. 2d 195, 200 (S.D.N.Y. 2007). The class action had been dismissed and there was no reason to expect it to rise from the dead. Plaintiffs here therefore had no business relying on that dismissed case as a basis to stay their hand and hold off bringing suit. Plaintiffs' CEA claims are, therefore, time-barred, even if the Silver Class Action had tolled the statute of limitations up to the point of its dismissal.

For these reasons, the Court holds that the statute of limitations was not tolled by the pendency of the Silver Class Action, and that, even if it were tolled, plaintiffs' CEA claims would still be time-barred. These claims therefore are dismissed as untimely.

### 2.      NYGBL § 349 Claim

Plaintiffs' NYGBL § 349 claim is subject to a three-year statute of limitations. N.Y. C.P.L.R. § 214(2). A § 349 private right of action accrues "when plaintiff has been injured by a deceptive act or practice violating section 349." *Gaidon v. Guardian Life Ins. Co. of Am.*, 96 N.Y.2d 201, 210 (2001). Thus, this cause of action accrued in early 2011 on the same dates that the plaintiffs' CEA claims accrued. For the same reasons discussed in connection with the CEA claims, plaintiffs have no argument that the statute of limitations was tolled by the pendency of the Silver Class Action. Plaintiffs' § 349 claims thus are time-barred—they expired in early 2014, about a year before the complaints were filed.[11]

---

[11] Plaintiffs' § 349 claims, if not time-barred, would clearly not survive the motion to dismiss. Plaintiffs cannot credibly maintain that the market in silver futures calendar spreads is "consumer oriented," as required to sustain such claims. Plaintiffs' sole basis for claiming that this element of a § 349 claim is met is that "the Complaints expressly allege broad impact on

### 3.      Antitrust Claims

Plaintiffs' antitrust claims under both federal and state law are subject to a four-year statute of limitations.  15 U.S.C. § 15b; N.Y. G.B.L. § 340(5).  As with the other statutes of limitations discussed above, "the statute begins to run when a defendant commits an act that injures a plaintiff's business."  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971).  Because the liquidations of each plaintiff's positions were completed less than four years before the filing of the respective complaints, plaintiffs' antitrust claims are not, in their entirety, time-barred.

JP Morgan, however, is correct that plaintiffs' claims are significantly clipped here by operation of the statute of limitations, in that injuries incurred more than four years before the complaints were filed are not cognizable.  In particular, JP Morgan notes that Wacker claims to have executed substantial trades on, *inter alia*, January 25, 2011 and February 3, 2011, more than four years before he filed his complaint (on February 4, 2015).  The Court agrees that the damages traceable to trades executed more than four years before the filing of the complaint are not recoverable.  *See Stolow v. Greg Manning Auctions Inc.*, 80 F. App'x 722, 725 (2d Cir. 2003) (summary order) (rejecting argument that "the continuing nature of the alleged illegal [anticompetitive] conduct tolled the statute of limitations" because "the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period") (quoting *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997)) (internal quotation marks omitted).

---

consumers, particularly with respect to numerous consumer goods that are made with silver."  Pl. Br. 39 (citing, *e.g.*, Shak Compl. ¶ 238).  But conclusory allegations of some downstream effect on consumers are insufficient where the product involved is "an instrument of high finance . . . hardly a product that individuals purchase for 'personal, family, or household use.'"  *In re Libor*, 2015 WL 4634541, at *85.

Nevertheless, as the parties agree, each set of plaintiffs has non-time-barred antitrust claims.  Specifically, the Shak plaintiffs may seek damages arising from trades occurring on or after January 22, 2011; Wacker may seek damages arising from trades occurring on or after February 4, 2011; and Grumet may seek damages arising from trades occurring on or after February 5, 2011.  Unlike the CEA and § 349 claims, plaintiffs' antitrust claims are, in part, timely.

### 4.    Unjust Enrichment Claim

Under New York law, claims of unjust enrichment are subject to a six-year limitations period where they seek equitable relief, but a three-year limitations period where they seek monetary damages.  *Matana v. Merkin*, 957 F. Supp. 2d 473, 494 (S.D.N.Y. 2013).  Further, when an unjust enrichment claim "is merely incidental to or duplicative of another claim with a shorter limitations period," the shorter period will apply.  *Malmsteen v. Berdon, LLP*, 477 F. Supp. 2d 655, 667 (S.D.N.Y. 2007).  Here, JP Morgan argues that a three-year limitations period applies, because plaintiffs' unjust enrichment claim duplicates their CEA claims in that they are "based on the same allegations."  Def. Reply Br. 6 (quoting *Spinale v. Tenzer Greenblatt, LLP*, 765 N.Y.S.2d 786, 786 (1st Dep't 2003)) (internal quotation marks omitted).  Plaintiffs counter that the unjust enrichment claim has different pleading requirements (conveyance of a benefit and a relationship between the parties) and enables different remedies (restitution and a constructive trust).  Pl. Br. 18.

On this point, the Court holds with JP Morgan.  The distinctions that plaintiffs draw between their unjust enrichment claim and their CEA claims are illusory.  The unjust enrichment claim is ultimately derivative and duplicative of the CEA claims—plaintiffs articulate no theory of unjust conduct independent of the alleged acts of market manipulation underlying the CEA claims.

Moreover, as to remedy, although restitution and formation of a constructive trust are indeed classed as equitable remedies, in ascertaining the governing statute of limitations, courts look beyond the form and to the substance of the sought-after remedy. *See Access Point Med., LLC v. Mandell*, 963 N.Y.S.2d 44, 47 (1st Dep't 2013) ("The calculated use of the term 'disgorgement' instead of other equally applicable terms such as repayment, recoupment, refund, or reimbursement, should not be permitted to distort the nature of the claim so as to expand the applicable limitations period from three years to six."). In this case, notwithstanding plaintiffs' game attempt to distinguish damages from restitution—the former focusing on the plaintiff's loss and the latter on the defendant's gain—the loss and the gain are two sides of the same coin, as plaintiffs elsewhere acknowledge. *See* Shak Compl. ¶ 245 ("Commodity futures trading and other derivatives trading is a zero sum game. To the extent that Defendants benefited from their extensive unlawful acts, they necessarily did so by forcing Plaintiffs to lose."). Plaintiffs may not overcome the fundamentally monetary nature of the recovery they seek by recasting it as a bid for restitution and a constructive trust. Allowing artful pleading to subvert the otherwise applicable statute of limitations would elevate form over substance. *See Matana*, 957 F. Supp. 2d at 494.

Plaintiffs' unjust enrichment claim is, therefore, time-barred.[12]

---

[12] For related reasons, plaintiffs' unjust enrichment claim, even if not time-barred, would not state a claim. "Generally, if there is an adequate remedy at law, a court will not permit a claim in equity." *Bongat v. Fairview Nursing Care Ctr., Inc.*, 341 F. Supp. 2d 181, 188 (E.D.N.Y. 2004) (citing *Strom v. Goldman, Sachs & Co.*, 202 F.3d 138, 144 n.6 (2d Cir. 1999)). Where, as here, the unjust enrichment claim amounts to "little more than a recasting" of the CEA and antitrust claims, plaintiffs fail to state a claim of unjust enrichment. *Crigger v. Fahnestock & Co.*, No. 01 Civ. 7819 (JFK), 2003 WL 22170607, at *12 (S.D.N.Y. Sept. 18, 2003).

**B.**     **Antitrust Claims**

To state a claim for monopolization under § 2 of the Sherman Act and § 4 of the Clayton Act,[13] plaintiffs must allege two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *PepsiCo, Inc. v. Coca–Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)).

To have standing to assert a § 2 claim, plaintiffs must also plead an antitrust injury. Antitrust injury is an injury that is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)); *see also Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 122 (2d Cir. 2007).

At the outset, the Court notes that plaintiffs' claims far more naturally describe conduct prohibited by the CEA.  The pricing machinations in which plaintiffs allege JP Morgan engaged to generate "backwardation" as to discrete silver futures contracts in early 2011 do not present a

---

[13] Section 2 of the Sherman Act, 15 U.S.C. § 2, provides:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

Section 4 of the Clayton Act, 15 U.S.C. § 15, confers standing on any private plaintiff "who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" and provides for treble damages.

paradigmatic Sherman Act § 2 claim.  And, as reviewed below, plaintiffs have scarcely attempted to plead the first § 2 element (the defendant's possession of monopoly power in the relevant market) by the ordinary means of alleging the defendants' market share.  There is, therefore, good reason to surmise that the antitrust claims were included as a hedge against the possibility (now realized) that the CEA claims would be held time-barred.

Nevertheless, it is possible for the same course of conduct to violate the CEA and the Sherman Act.  *See Strobl v. N.Y. Mercantile Exch.*, 768 F.2d 22, 28 (2d Cir. 1985) (rejecting argument that conduct specifically prohibited by the CEA falls outside the ambit of an antitrust claim); *In re Crude Oil*, 913 F. Supp. 2d at 47 (denying motion to dismiss CEA and Sherman Act § 2 claims); *In re Term Commodities Cotton Futures Litig.* ("*In re Cotton Futures*"), No. 12 Civ. 5126 (ALC), 2013 WL 9815198, at *19, *27 (S.D.N.Y. Dec. 20, 2013) (same).  The Court, accordingly, examines the adequacy of plaintiffs' pleadings of antitrust violations.

### 1.      Monopoly Power

As to the first element, plaintiffs allege that JP Morgan possessed monopoly power in the "silver futures spread market and in particular the 'long-dated' silver futures spread market." Shak Compl. ¶ 52.

Ordinarily, monopoly power is established through proof that the defendant has a "large percentage share of the relevant market."  *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 227 (2d Cir. 2006).  Although plaintiffs do not expressly abandon this means of proof, they argue that such a showing is "unnecessary when a section 2 claim is based on 'direct evidence of anticompetitive effects,'" Pl. Br. 31 (quoting *In re Crude Oil*, 913 F. Supp. 2d at 51), and their opposition to JP Morgan's motion to dismiss largely relies on this alternative approach.  JP Morgan, for its part, disputes that direct evidence of anticompetitive effects—*i.e.*, control of prices or exclusion of competitors—can alone suffice to show monopoly power.  In any event, JP

23

Morgan argues, "even if a plaintiff pleads direct evidence of market control—rather than indirect evidence of control in the form of market share—it must still plead a relevant market," and, JP Morgan asserts, plaintiffs have not done so here.  Def. Reply Br. 16 (citing *Heerwagen*, 435 F.3d at 229).

It is, therefore, necessary to first review the governing law as to the means by which the monopoly-power element can be established.  In 1998, the Second Circuit held that monopoly power can be established in either of two ways:  It "may be proven directly by evidence of the control of prices or the exclusion of competition, *or* it may be inferred from one firm's large percentage share of the relevant market."  *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 98 (2d Cir. 1998) (emphasis added).  In 2002, the Circuit stated that "there is authority to support [plaintiff's] claim that a relevant market definition is not a necessary component of a monopolization claim," citing, *inter alia*, the passage from *Tops Markets* quoted above. *PepsiCo, Inc.*, 315 F.3d at 107.  In 2004, the Circuit again cited the *Tops Markets* passage in the course of analyzing whether plaintiffs had demonstrated monopoly power by *either* direct evidence of price control or exclusion of competitors, or indirect evidence of a defendant's market share.  *See Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 500–501 (2d Cir. 2004).  Finally, in 2006, in *Heerwagen*, the Circuit again quoted, with seeming approval, the same *Tops Markets* passage.  *See* 435 F.3d at 227.

In the face of this body of authority, JP Morgan argues that the Circuit, in *Heerwagen*, tacitly repudiated the direct-evidence option.  JP Morgan overreads *Heerwagen*.  In that case, the Circuit did indeed state that a plaintiff offering direct evidence of price control or exclusion of competitors must still prove its claim "with reference to a particular market."  *Id.* at 229.  But this statement does not close off this route to proving monopoly power.  Rather, it teaches that a

plaintiff who elects to proceed by offering direct evidence of monopoly power must situate that alleged power in the context of a particular market, such that the facts not only support anticompetitive conduct, but also that such conduct is indicative of a defendant's status as a monopolist.  *See In re Aluminum Warehousing Antitrust Litig.*, No. 13 MD 2481 (KBF), 2014 WL 4277510, at *35 (S.D.N.Y. Aug. 29, 2014) (distinguishing "reference to a particular market," required by *Heerwagen*, from *definition* of a *relevant* market, required for showing monopoly power via market share).

Reading *Heerwagen* to tacitly repudiate the direct-evidence mode of proof altogether, however, is inconsistent with the Circuit's repeated approval of the *Tops Markets* passage, including in *Heerwagen* itself.[14]  And, since *Heerwagen*, district courts in this Circuit have continued to acknowledge that direct evidence of price control or exclusion of competitors may be used to prove monopoly power.  *See In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 454 (S.D.N.Y. 2015); *In re Cotton Futures*, 2013 WL 9815198, at *24; *In re Crude Oil*, 913 F. Supp. 2d at 51.

The Court, therefore, rejects JP Morgan's invitation to hold that the direct-evidence route to demonstrating monopoly power has been closed off.  The Second Circuit, despite repeated opportunities to close off this route, has not done so.  Absent clearer guidance from the Circuit, the Court therefore holds that monopoly power may be established, not only by proof of a defendant's market share in a relevant market, but alternatively by direct evidence of a defendant's price control or exclusion of competitors from a particular market in a manner indicative of its possession of monopoly power.

---

[14] *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230 (2d Cir. 2008), on which JP Morgan also relies, likewise fails to show repudiation of the direct-evidence route.

The Court therefore turns to consider whether plaintiffs' pleadings are adequate, by either available means, to allege monopoly power.

a.      *Evidence of JP Morgan's market share*

In § 2 cases, plaintiffs commonly rely on indirect evidence of a defendant's monopoly power, based on proof of its market share, "because direct measures are often difficult or impossible to prove." *Heerwagen*, 435 F.3d at 227. Such "proof that the defendant has a large percentage share of the relevant market" functions as "a 'surrogate' for direct proof of market power." *Id.* To allege monopoly power by this means, a plaintiff must satisfactorily allege both a plausible definition of a relevant market and excess market share in that market.

As to the market definition, "[t]he relevant market must be defined 'as all products reasonably interchangeable by consumers for the same purposes,' because the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level." *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011) (quoting *Geneva*, 386 F.3d at 496) (internal quotation marks omitted). "Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001).

Still, "an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand." *Id.* at 200 (quoting *Gianna Enters. v. Miss World (Jersey) Ltd.*, 551 F. Supp. 1348, 1354 (S.D.N.Y. 1982) (internal quotation marks omitted)). Thus, "[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion

26

to dismiss may be granted." *Chapman v. New York State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)) (internal quotation marks omitted).

Plaintiffs' complaints here define the relevant market as the "silver futures spread market and in particular the 'long-dated' silver futures spread market." Shak Compl. ¶ 52. They do not, however, explain the basis for this definition. JP Morgan accordingly argues that these pleadings fail to define a relevant market because they "are devoid of allegations that this limited group of products—long-dated COMEX silver futures spreads—is not interchangeable with, for example, physical silver, OTC silver, or other silver derivatives." Def. Br. 29.

Plaintiffs counter by relying on Judge Pauley's decision in *In re Crude Oil* as establishing that the relevant market need not encompass both a physical commodity and related derivatives. Pl. Br. 32 (citing *In re Crude Oil*, 913 F. Supp. 2d at 54). However, *In re Crude Oil* is readily distinguishable. It involved allegations that defendants amassed a dominant position in physical crude oil and then dumped the commodity onto the market on certain dates with the purpose and effect of shifting futures prices, so as to benefit defendants' positions in certain calendar spreads. *See In re Crude Oil*, 913 F. Supp. 2d at 49–50. Here, in contrast, there are no allegations of any connection between defendants' positions or activities in the physical silver market, on the one hand, and the derivatives market, on the other. In other words, there is no allegation, let alone a concrete one supported by specific factual allegations, that "monopoly power in the relevant market enables defendants to control prices in a different but closely related market." *Id.* at 54.

Under these circumstances, JP Morgan's critique of plaintiffs' definition of the relevant market as the "silver futures spread market and in particular the 'long-dated' silver futures spread market" is apt. That definition is an *ipse dixit*. Plaintiffs fail entirely to allege why, for example,

physical silver or other silver derivatives products are not interchangeable.  This glaring pleading lapse makes plaintiffs' market definition implausible.  *See Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 577 (S.D.N.Y. 2011) (plaintiff "must allege sufficient facts about other [potential substitutes] to make its proposed product market plausible").  Furthermore, it is far from clear that the market as plaintiffs conveniently define it—excluding physical silver and other silver derivative products—would withstand close review.  Even *In re Crude Oil*, on which plaintiffs rely, memorably noted that "it took two markets to contango"—that is, the relevant market in commodity futures manipulation cases will often "consist[] of [futures contracts] *together* with the supply of [the physical commodity] deliverable on those expiring contracts."  913 F. Supp. 2d at 54 (quoting *Minpeco, S.A. v. Hunt*, 718 F. Supp. 168, 171 (S.D.N.Y. 1989) (emphasis added).

Even if plaintiffs' complaints had plausibly defined the relevant market as the silver futures spread market, they fail to adequately plead JP Morgan's share of that market.  Plaintiffs allege that JP Morgan's market power "is demonstrated by the high percentage of open interest it comprised in the deferred spreads" and by "the percentage of total volume JP Morgan's [sic] commanded on particular trading days."  Shak Compl. ¶ 58.  And, they allege, JP Morgan was one of only two or three market makers in the silver futures spread market.  *Id.* ¶¶ 49–51.  These pleadings, however, are little more than vague generalities about the spread market as a whole combined with evidence about trading in specific spread contracts on specific dates.  Such allegations are inadequate to allege JP Morgan's share of market power in the "silver futures spread market."

Seeking to sustain their market definition, plaintiffs' counsel, at argument, urged that the Court could find market share limited to a several-day timespan.  *See* Tr. 47 (arguing that *In re*

*Crude Oil* "teaches that [market share] doesn't have to be long lived"). But that observation, even if true, does not rectify the complaints' failure to explain the parameters of the market as defined, or to satisfactorily take into account potential interchangeable products identified by JP Morgan. And in any event, *In re Crude Oil* and the cases on which it relies are factually quite distinct. Judge Pauley sustained a market defined as the January, March and April 2008 markets in physical WTI crude oil available in Cushing, Oklahoma, a market whose definition is far narrower and more clearly delineated than that offered here. *See In re Crude Oil*, 913 F. Supp. 2d at 53; *see also Thompson's Gas & Elec. Serv., Inc. v. BP Am. Inc.*, 691 F. Supp. 2d 860, 867 (N.D. Ill. 2010) (relevant market is physical supply of propane deliverable in a specific month); *Minpeco*, 718 F. Supp. at 171 (relevant market is specified futures contracts, along with physical silver supply deliverable on them). And plaintiffs' allegations in *In re Crude Oil* were far more concrete as to defendants' market share (between 84% and 92% during those months) and included extensive allegations as to defendants' price control within the market as defined. *See* 913 F. Supp. 2d at 53, 58. Under these circumstances, Judge Pauley held that plaintiffs' product and temporal market definitions, including its definition of the market to exclude alternate grades of crude oil, as well as crude oil available on the global market, were plausible. *See id.* at 54. Plaintiffs' allegations about JP Morgan's heavy trading on several dates in particular contracts is no substitute for crystallized pleadings of this nature. JP Morgan's trading on these dates reveals little, if anything, about JP Morgan's power in the overall silver futures spread market more broadly, let alone why that represents a proper market definition.

Plaintiffs' complaints, therefore, fail to plead monopoly power by conventional means—by alleging sufficient market share in a properly pled market. To adequately plead monopoly power in a relevant market through evidence of JP Morgan's market share, plaintiffs' pleadings

would need to be substantially more fulsome—both as to possible substitutes for silver spread

contracts (so as to plead a proper market) and as to JP Morgan's share of this market.

> b.  *Direct evidence of anticompetitive effects*

Plaintiffs primarily attempt to satisfy the monopoly-power element by means of direct

evidence of price control or exclusion of competitors.  They allege that, on "a nearly daily basis"

in early 2011, JP Morgan placed large, uneconomic orders just before the close of trading.  Shak

Compl. ¶ 6.  They allege that it did so, with the intention of using these orders and its dominant

market position as to silver futures contracts, to influence settlement prices in a direction that

favored its calendar spread positions, for the settlement committee relied on such market

information in setting prices.  *See* Shak Compl. ¶ 67.  These uneconomic orders, plaintiffs allege,

drove the silver spreads market into the rare state of "backwardation," causing an anomalous

divergence between silver spreads and OTC silver prices.  This divergence, plaintiffs' expert

concluded, cannot be accounted for by alternative causes (*e.g.*, other market forces or structural

changes in the market).  *See id.* ¶ 129.

As noted above, in two recent decisions, courts in this District recognized a plaintiff's

ability to use direct evidence of price control to plead monopoly power, and relied on such

evidence, in part, in denying motions to dismiss.  These decisions offer instructive guidance in

considering whether plaintiffs here have satisfactorily alleged monopoly power by this means.

In the first case, *In re Crude Oil*, Judge Pauley denied a motion to dismiss CEA and

Sherman Act § 2 claims stemming from an alleged scheme to manipulate futures prices for West

Texas Intermediate (WTI) crude oil.  913 F. Supp. 2d at 46–47.  The complaint alleged that

defendants (collectively, "Parnon"), during January 2008, (1) acquired a substantial long position

in the February/March 2008 calendar spreads; (2) acquired a dominant position (roughly 92%) in

physical WTI crude oil—that is, bought up most of the crude oil available at Cushing, OK,

where WTI crude oil futures contracts are settled—thereby driving up the price of the February/March calendar spreads before finally liquidating its position in those spreads; (3) acquired a substantial *short* position in the March/April 2008 calendar spread; and (4) liquidated its physical WTI position on a date in late January when the market would not have expected such a dramatic increase in supply, such that February prices plummeted relative to March prices, benefitting defendants' calendar spread positions.  *See id.* at 49–50.

In holding that the complaint adequately pled Parnon's monopoly power, Judge Pauley emphasized the following allegations: (1) "the market's abrupt shift from backwardation to contango when Parnon dumped its physical WTI position," an anomalous shift that "happened only twice between January 2006 and January 2011—both times on the precise days Parnon dumped its WTI supply," *id.* at 51; (2) defendants' acquisition of "up to 92% of the next month's deliverable WTI supply," *id.* at 52; and (3) defendants' intentional acquisition of "substantial positions in WTI calendar spreads that it knew would respond favorably to its activities in the physical market," *id.*  In denying Parnon's motion to dismiss, Judge Pauley emphasized that "Defendants' ability to change the market from backwardation to contango is . . . a 'direct measure' of control."  *Id.* at 51 (quoting *CFTC v. Parnon,* 875 F. Supp. 2d 233, 246 (S.D.N.Y. 2012)).

In the second case, *In re Cotton Futures*, Judge Carter denied a motion to dismiss CEA and Sherman Act claims arising from alleged power over and manipulation of the cotton futures market.  2013 WL 9815198, at *1.  The complaint alleged that defendants had uneconomically insisted on delivery of certificated stocks of cotton under its futures contracts, at a time when they could have purchased lower-priced cotton in the cash market, laying the groundwork for a squeeze that allowed defendants to artificially manipulate futures prices upward, to the benefit of

their long positions. *See id.* at *3–7. Citing *In re Crude Oil*, Judge Carter held that the alleged market anomalies—*i.e.*, a "'U-turn' in backwardation resulting in 'the highest percentage backwardation and the highest absolute backwardation of any May-July Contract'" in the last 11 years—supplied direct evidence of defendants' ability to control prices. *Id.* at *24. Judge Carter also highlighted the allegation that defendants "controlled 99% of the relative market during the relevant period." *Id.* at *25.

Synthesizing these two cases, they illustrate that concrete allegations of a dominant position in either a physical commodity or a related futures market, combined with significant pricing anomalies that are closely correlated with defendants' alleged conduct, may be sufficient to plead monopoly power. Although not nearly as detailed as the allegations in *In re Crude Oil* in particular, plaintiffs' allegations here are of the same character. Plaintiffs allege—albeit generally—that JP Morgan, as one of the few major players in the silver futures market, was able to amass a dominant position in certain spread contracts. They further allege significant pricing anomalies in certain silver futures spread contracts beginning in early 2011, just around the time that, according to plaintiffs, JP Morgan was manipulating the settlement committee to obtain favorable settlement prices. Although these allegations are not precise enough to plead market share, particularly given the complete absence of adequate pleadings on the issue of *defining* the market, they are sufficient at this stage to allege direct evidence of anticompetitive effects, namely control over prices.

These allegations make plausible plaintiffs' claim that, like the defendants in *In re Crude Oil* and *In re Cotton Futures*, JP Morgan possessed monopoly power on the dates in question. And these allegations *have* been made "with reference to a particular market," as *Heerwagen* requires: the silver futures spread market. *Heerwagen* does not require that a plaintiff who

alleges monopoly power by means of direct evidence of price control define the market with the same precision and punctiliousness (*e.g.*, to exclude potential interchangeable products) that a plaintiff who alleges monopoly power solely by means of alleging the defendant's market share must.  And the Court is unaware of other authority erecting such a pleading requirement.

Therefore, plaintiffs have adequately alleged monopoly power.

### 2.       Willful Acquisition of Monopoly Power

To state a claim for monopolization under § 2, plaintiffs must also allege "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *PepsiCo, Inc.,* 315 F.3d at 105 (quoting *Grinnell*, 384 U.S. at 570–71).  "To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*."  *Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (emphasis in original).  Moreover, the "willful" acquisition of monopoly power "certainly requires proof of intent."  *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1359 (2d Cir. 1988).  Evidence of intent is relevant to "whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive.'"  *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985).

In other words, a defendant's conduct must not only be anticompetitive in effect, but anticompetitive in purpose as well.  It must have been undertaken to obtain or cement monopoly power.  The plaintiff must demonstrate exclusionary conduct—as opposed to gloves-off, hard-nosed market competition—aimed at obtaining or enshrining monopoly power, "harm[ing] the competitive *process* and thereby harm[ing] consumers."  *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (emphasis in original).

Plaintiffs identify three categories of conduct by JP Morgan that, they claim, were of this nature.  First, they allege that JP Morgan placed large, uneconomic orders just before the close of trading for the purpose of influencing settlement prices.  *See, e.g.*, Shak Compl. ¶¶ 65–67. Second, they allege that JP Morgan (specifically Gottlieb) "caused" certain floor brokers and clerks to "harangue" COMEX employees to set JP Morgan's desired settlement prices, in part by pointing to JP Morgan's own "uneconomic, artificially tight bids and offers for calendar spreads."  *Id.* ¶ 73.  Third, they allege that JP Morgan "refus[ed] to provide spread quotes that would allow Plaintiffs to exit" the market.  *Id.* ¶ 59; *see also* Wacker Compl. ¶ 80; Grumet Compl. ¶¶ 80–81.

JP Morgan makes two arguments in response.  First, it argues, plaintiffs' allegations as to such practices "are entirely general," and their complaints "identify no actual acts of abuse or uneconomic orders."  Def. Reply Br. 17.  Second, JP Morgan argues, even if this conduct were pled with adequate specificity, it is not exclusionary.  In other words, even if JP Morgan exploited its monopoly power on a given date so as to achieve pricing benefits for itself, "none of [that conduct] excludes competitors from the market."  *Id.*

For the reasons that follow, the Court agrees that plaintiffs have failed to adequately plead willful acquisition of monopoly power.  Plaintiffs' claims as to the practices alleged are, for the most part, pled in unacceptably vague terms.  And plaintiffs' complaints fail to adequately plead conduct aimed at acquiring or maintaining monopoly power.

As *In re Crude Oil* and *In re Cotton Futures* reveal, "an *intentionally* manipulative trading strategy to raise the prices of [futures] in order to profit from [defendants'] long positions" may constitute exclusionary conduct.  *In re Cotton Futures*, 2013 WL 9815198, at *25.  But, to support such an inference, the allegations must be of conduct that, were it not

intended to obtain or sustain monopoly power, would be uneconomic and irrational.  In other words, the alleged conduct must be such that a reasonable inference of intent to control prices and exclude competitors may be drawn.

The detailed complaints in those two cases alleged such behavior.  In *In re Cotton Futures*, the 99-page operative complaint alleged an "interconnected series of uneconomic steps [and] highly unusual steps . . . contrary to the customs and practices of cotton market participants."  No. 12 Civ. 5126 (ALC), Dkt. 65 ("*Cotton* Compl."), ¶ 44(b).  Boiled down, the facts alleged were these:  Defendants amassed large long positions in the May 2011 and July 2011 ICE [Intercontinental Exchange] cotton futures contracts, meaning they had the right to demand delivery at the expiration of those contracts.  *Id.* ¶ 45.  However, delivery is very rarely demanded on such futures contracts; instead, futures traders will typically offset their purchases with corresponding sales.  *Id.* ¶¶ 18–19.  Further, the complaint alleged that defendants' need for physical cotton "could have been satisfied much more cheaply in the cash markets."  *Id.* ¶ 109.  But instead of buying this lower-priced cotton on the cash markets and selling their higher-priced futures contracts, defendants insisted on delivery.  *Id.* ¶ 63.  This caused anomalous increases in the amount of open interest on these futures contracts as the settlement dates approached.  *Id.* ¶ 52.  It also caused an anomalous divergence between the cash and futures markets:  In the cash markets, cotton prices continued to fall, but while this would normally dictate lower prices for short-term futures contracts, those contract prices remained inflated because of defendants' unprecedented demands for delivery.  *Id.* ¶¶ 56, 65.  At this time, however, it was too late to increase the deliverable supply of cotton in the ICE warehouses, *id.* ¶ 52(l), and the existing supply was too low to satisfy defendants' positions through delivery, *id.*  ¶¶ 21(a)–(b).  Thus, traders who had short positions on the futures contracts were forced to pay artificially high prices

in order to liquidate those positions.  *Id.* ¶ 11.  These facts, Judge Carter held, raised a

"reasonable inference of anticompetitive conduct."  2013 WL 9815198, at *25.

In *In re Crude Oil*, the complaint alleged that defendant Parnon, aware of low supply in

physical crude oil, amassed a large long calendar spread position by which it would profit if the

price of February WTI crude oil futures was higher than the price of March futures.  11 Civ.

3600, Dkt. 66 ("*Crude Oil* Compl."), ¶ 49(b).  Parnon then purchased around 92% of the

deliverable supply of physical crude oil, leading the market to perceive scarcity of supply.  *Id.* ¶

50(b).  Parnon retained its physical position through the expiry date of the February/March

contracts—and then liquidated its calendar spread positions at the artificially inflated prices it

had created through its purchase of physical crude oil.  *Id.* ¶ 50 (c)–(f).  Next, Parnon amassed a

*short* position in March/April calendar spreads at the artificial prices they had caused.  *Id.* ¶ 51.

Then Parnon dumped its physical supply on the market, so that the market abruptly moved from

backwardation to contango, and the value of Parnon's short calendar spreads increased.  *Id.* ¶ 52.

Parnon did all this, the complaint crucially alleged, despite having "no commercial need for WTI

crude oil," and despite realizing that selling a large quantity of crude oil right after the expiration

of the next month's futures contracts "would result in substantial losses (absent a manipulation)."

*Id.* ¶ 50(e).  Thus, although Parnon lost more than $15 million by selling its physical positions, it

realized profits of more than $50 million as a result of its related calendar spread positions.  *Id.* ¶

65.  These allegations were sufficient to support an inference of anticompetitive conduct aimed

at undermining competitors' market positions.  *In re Crude Oil*, 913 F. Supp. 2d at 56 (citing,

*inter alia*, *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1062 (8th Cir. 2000) ("[I]f

the conduct has no rational business purpose other than its adverse effects on competitors, an

inference that it is exclusionary is supported." (internal quotation marks omitted)).

The facts pled here as to ostensibly exclusionary conduct are a far cry from those pled in *In re Crude Oil* and *In re Cotton Futures*.  No allegations raise a non-speculative inference that JP Morgan's orders were "uneconomic" or that its representations to the COMEX staff or other market conduct were incompatible with the rational behavior of a legitimate competitor.  *See Silver Class Action II*, 2013 WL 1100770, at *6 (dismissing claims, and noting that "[p]laintiffs' factual allegations [do not] make it clear that the apparently legitimate transactions which JPMorgan is alleged to have made on the COMEX silver futures market were made for illegitimate or anticompetitive reasons, *i.e.*, an abuse of monopoly power").

To be sure, plaintiffs' claims that JP Morgan clustered its orders at the close of trading, *see* Shak Compl. ¶ 66, and made allegedly contradictory SIFO submissions, *see id.* ¶¶ 186–96, are not inconsistent with a scheme to acquire or maintain monopoly power.  But they do not go beyond that to affirmatively plead the existence of such a scheme or to differentiate it in likelihood from conduct permissible under § 2.  *See Twombly*, 550 U.S. at 554.  In *In re Crude Oil* and *In re Cotton Futures*, the uneconomic nature of defendants' conduct was far more patent: As alleged, defendants were taking short-term, separate losses (by selling physical crude oil and by not buying cotton on the cash markets, respectively) in order to reap far larger gains by virtue of their dominant positions in certain futures contracts.  Here, in contrast, plaintiffs' complaints simply conclude—rather than show—that JP Morgan's bids and offers were "uneconomic," *see* Shak Compl. ¶ 67, and declare, *ipse dixit*, there "was no legitimate justification" for reporting significantly more tightness in the spreads market than in the over-the-counter markets, *id.* ¶ 69.

Plaintiffs' complaints further contrast with *In re Crude Oil* in that there are no allegations of statements by JP Morgan officials revealing the exclusionary purpose of the company's actions.  The complaint in *In re Crude Oil* quoted numerous communications indicative, as Judge

37

Pauley found, of such anticompetitive knowledge and intent. *See Crude Oil* Complaint ¶¶ 47,

49, 52, 59. For instance, the complaint quoted communications from defendants to the effect

that (1) there was a "shitload of money to be made shorting" the calendar spreads, *id.* ¶ 47; (2)

the liquidation of defendants' physical crude oil position represented an "inevitable puking" and

that it had "the desired effect" on spread prices, *id.* ¶ 52; and (3) the scheme had affected the

spreads "but not as much as hoped," *id.* ¶ 59(d). No similar communications are alleged here.

In the end, plaintiffs' claims pivot on the allegation that JP Morgan behaved in an

exploitative manner towards counterparties on several days in early 2011. In general terms, they

allege that, on these days, JP Morgan placed uneconomic orders at the close of trading and made

misrepresentations to the settlement committee. But these allegations not only lack specifics—

including, for particular orders, details such as dates, names, amounts, and prices. More

fundamentally, they fail to connect this conduct to a scheme to willfully acquire or maintain

monopoly power.

Plaintiffs also allege that JP Morgan, after exerting pressure on plaintiffs' positions,

refused to provide spread quotes and attempted to hide its positions adverse to the Shak plaintiffs

by enlisting hedge fund Wolverine to take over some of these positions. *See* Pl. Br. 34–35; Tr.

52–53. But these factual allegations suffer from the same failings as plaintiffs' other allegations.

First, they are imprecise: Plaintiffs are vague on when exactly spread quotes were refused them,

by whom, and for how long. Indeed, at least Wacker's and Grumet's complaints, closely read,

do not concretely reveal a refusal to provide spread quotes at all. *See* Wacker Compl. ¶¶ 9, 80

(Gottlieb said he "would help [Wacker] exit the spread"); Grumet Compl ¶¶ 9, 80–81 (Grumet

had to wait one day to obtain spread quote because Gottlieb was out of the office at a family funeral).[15]

Second, plaintiffs' complaints fail to allege that the refusal to provide spread quotes on these days was a stratagem aimed at acquiring and/or maintaining monopoly power. As to the *acquisition* of monopoly power, plaintiffs' complaints allege, to the contrary, that JP Morgan *initially* acquired monopoly power in the silver futures market by being the last man standing after other market makers "disappeared." Shak Compl. ¶ 49. This allegation does not violate § 2. Without more, it describes a mere "historic accident," not deliberate conduct to secure a monopoly position. *PepsiCo*, 315 F.3d at 105. Plaintiffs do not explain why JP Morgan's failure to provide spread quotes, or any other conduct in early 2011, helped it acquire monopoly power. Nor do plaintiffs claim, let alone explain why, this conduct helped JP Morgan maintain such power. Rather, plaintiffs allege merely that, after forcing out Shak, "JP Morgan's market power in the calendar spreads increased," and its "ability to manipulate the market became unfettered." Shak Compl. ¶ 81; *see also* Wacker Compl. ¶ 75 ("By forcing Daniel Shak out of the market, only smaller market participants, like [Grumet], were there to trade against JP Morgan."); Grumet Compl. ¶ 75 (same). This allegation is far too vague and conclusory to adequately plead that, in so acting, JP Morgan sought to maintain its monopoly power.

In sum,  unlike the plaintiffs in *In re Crude Oil* and *In re Cotton Futures*, plaintiffs here have not made concrete allegations plausibly suggesting uneconomic behavior intended to

---

[15] Plaintiffs separately fail to explain why JP Morgan was under any duty to deal with plaintiffs at all. "[T]he sole exception to the broad right of a firm to refuse to deal with its competitors comes into play only when a monopolist seeks to terminate a prior (voluntary) course of dealing with a competitor." *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 134 (2d Cir. 2014), *as corrected* (June 19, 2014) (quoting *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52, 53 (2d Cir. 2007)) (internal quotation marks omitted).

acquire or maintain monopoly power, or satisfactorily distinguished JP Morgan's conduct from

that of a rational, hard-nosed market actor.  This pleading deficiency requires dismissal of the § 2

claim of monopolization.[16]

### 3. Antitrust Injury

To have standing to pursue a § 2 monopolization claim, plaintiffs must plead antitrust

injury, that is, injury "of the type the antitrust laws were intended to prevent and that flows from

that which makes defendants' acts unlawful."  *Atl. Richfield Co.*, 495 U.S. at 334 (quoting

*Pueblo Bowl–O–Mat*, 429 U.S. at 489).  The Second Circuit employs a three-step process to

determine whether a plaintiff has sufficiently alleged antitrust injury:

> First, the party . . . must identify the practice complained of and the reasons such a
> practice is or might be anticompetitive.  Next, we identify the actual injury the
> plaintiff alleges. . . . Finally, we compare the anticompetitive effect of the specific
> practice at issue to the actual injury the plaintiff alleges.

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013) (citations, internal

quotation marks, and alterations omitted).  In short, "[t]he necessary 'antitrust injury' is an injury

attributable to the anticompetitive aspect of the practice under scrutiny."  *Port Dock & Stone*

*Corp.*, 507 F.3d at 122.

Here, JP Morgan argues, *inter alia*, that plaintiffs must allege not only a causal link

between their injury and the asserted violation, but also that JP Morgan's conduct affected the

market generally.  Def. Br. 34.  Plaintiffs counter that JP Morgan's conduct was anticompetitive

"insofar as it forced Plaintiffs out of the market."  Pl. Br. 37.  The Court's holding above—that

---

[16] For similar reasons, plaintiffs also fail to state a claim of attempted monopolization, which
requires a showing of, *inter alia*, specific intent to monopolize.  *In re Crude Oil*, 913 F. Supp. 2d
at 57 (citing *Int'l Distrib. Ctrs. Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 790 (2d Cir. 1987)).
They also fail to state a claim under New York's Donnelly Act, which "require[s] identical basic
elements of proof for claims of monopolization or attempt to monopolize" as the Sherman Act.
*Altman v. Bayer Corp.*, 125 F. Supp. 2d 666, 672 (S.D.N.Y. 2000).

plaintiffs have not adequately pled exclusionary or anticompetitive conduct—would appear to compel the conclusion that they have failed to allege antitrust injury as well, because the latter inquiry turns, *inter alia*, on "the reasons [defendants'] practice is or might be anticompetitive." *Gatt*, 711 F.3d at 76. However, because plaintiffs' antitrust claims independently fail to state a claim as a result of their deficient pleading of the willful acquisition element, the Court has no need to resolve this issue at this time.

### 4. Conspiracy Claim

A Sherman Act § 2 claim for conspiracy to monopolize requires facts giving rise to a plausible inference of "(1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize." *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 246 (2d Cir. 1997) (quoting *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988)) (internal quotation marks omitted). As to the requirement of concerted action, plaintiffs must "allege facts that would provide 'plausible grounds to infer an agreement.'" *In re Elevator Antitrust Litig.*, 502 F.3d at 50 (quoting *Twombly*, 550 U.S. at 556).

Here, plaintiffs fail to allege an agreement. They argue that "the Complaints plead that Defendants conspired with COMEX's settlement committee to manipulate silver spread prices." Pl. Br. 35. In fact, the cited paragraph alleges merely that JP Morgan's brokers *sat* on the settlement committee. *See* Shak Compl. ¶ 67. Plaintiffs further argue that "JP Morgan also joined with Wolverine to conceal its control of the silver spread market by having Wolverine take over the Shak Plaintiffs' silver spread positions." Pl. Br. 35–36. But, in fact, the paragraphs that plaintiffs cite for this proposition allege only that Wolverine "had significant links to JP Morgan." Shak Compl. ¶ 79. These allegations fall short of what is necessary to adequately allege a conspiracy.

## CONCLUSION

For the foregoing reasons, the Court grants JP Morgan's motions to dismiss in their entirety.  The Clerk of Court is directed to close the motion pending at Dkt. 21 for 15 Civ. 992; Dkt. 20 for 15 Civ. 994; and Dkt. 19 for 15 Civ. 995.  The Court grants plaintiffs leave to file amended complaints limited to their Sherman Act § 2 claims and the corresponding state-law cause of action, solely to permit plaintiffs, in the event that they are aware of facts that would rehabilitate these claims, to add such facts to their pleadings.  Any Amended Complaints are due two weeks from today.  If no such complaints are timely filed, the Court's dismissal will be with prejudice.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: January 12, 2016
       New York, New York

42