UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/29/16
```

------------------------------------------------------------X

DANIEL SHAK and SHK DIVERSIFIED, LLC      :
(and/or their successors in interest),           :
                                                 :
                              Plaintiffs,        :        15 Civ. 992 (PAE)
                                                 :
          -v-                                    :
                                                 :
JPMORGAN CHASE & CO. et al.,                     :
                                                 :
                              Defendants.        :
------------------------------------------------------------X
                                                 :
THOMAS WACKER,                                   :
                                                 :
                              Plaintiff,         :        15 Civ. 994 (PAE)
                                                 :
          -v-                                    :
                                                 :
JPMORGAN CHASE & CO. et al.,                     :
                                                 :
                              Defendants.        :
------------------------------------------------------------X
                                                 :
MARK GRUMET,                                     :
                                                 :
                              Plaintiff,         :        15 Civ. 995 (PAE)
                                                 :
          -v-                                    :
                                                 :        OPINION & ORDER
JPMORGAN CHASE & CO. et al.,                     :
                                                 :
                              Defendants.        :
------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

          These consolidated cases, involving allegations of price manipulation in a commodities

derivatives market, come before the Court for a second time on a motion to dismiss.  Plaintiffs,

sophisticated individual commodities traders, participated in the market in silver futures calendar

spreads.  They allege that defendants (collectively, "JP Morgan") manipulated prices to benefit their positions and thereby forced plaintiffs out of the market.  On January 12, 2016, the Court dismissed plaintiffs' initial Complaint, which brought various claims, but granted plaintiffs leave to amend their antitrust claims.  *See* Dkt. 43,[1] *reported at Shak v. JPMorgan Chase & Co.*, No. 15 Civ. 992 (PAE), 2016 WL 154119 (S.D.N.Y. Jan. 12, 2016) ("January 12 Decision" or "*Shak*").  Plaintiffs timely filed an Amended Complaint and then a Second Amended Complaint, adding limited factual allegations.

JP Morgan now again moves to dismiss plaintiffs' antitrust claims.  For the reasons that follow, the Court grants the motion to dismiss, this time with prejudice.

## I.   Background

### A.   Procedural History

Plaintiffs initiated these actions in early 2015 by filing lawsuits in New York state court.  *See* Dkt. 1.  On February 11, 2015, JP Morgan removed the case to this Court.  *Id.*  On April 20, 2015, plaintiffs filed the Complaint here.  Dkt. 14 ("Compl.").  It brought seven causes of action: (1) three under the Commodities Exchange Act ("CEA"), 7 U.S.C. §§ 1, *et seq.*; (2) one under Section 2 of the Sherman Act, 15 U.S.C. § 2, alleging monopolization, conspiracy to monopolize, and attempt to monopolize; (3) one under New York General Business Law ("NYGBL") § 340, alleging monopolization; (4) one under NYGBL § 349, alleging deceptive acts in the conduct of business; and (5) a state common-law claim for unjust enrichment.

On June 19, 2015, JP Morgan moved to dismiss.  Dkt. 21.  On January 12, 2016, the Court granted the motion to dismiss with prejudice as to the CEA claims, the NYGBL § 349

---

[1] Unless otherwise noted, all docket numbers refer to the docket in *Shak*, 15 Civ. 992.  Because the pending motion to dismiss turns on allegations common to all three Complaints, the Court uses that Complaint as a proxy for those of the other two plaintiffs.  For clarity's sake, the Court refers, in the singular, to "the Complaint" and "the Second Amended Complaint."

claim, and the unjust enrichment claim, on the ground that these claims were all untimely. *See Shak*, 2016 WL 154119, at *8–10. The Court also dismissed the federal and state antitrust claims for failure to state a claim, but granted leave to amend. *See id.* at *20. (The Court recaps *infra* at Section I.C the bases for the dismissal.)

On January 26, 2016, plaintiffs timely filed an Amended Complaint, re-pleading all claims, even those that had been dismissed with prejudice. Dkt. 44. The next day, the Court directed plaintiffs to file a revised pleading that omitted the non-antitrust claims. Dkt. 45. On January 28, 2016, plaintiffs did so, filing the Second Amended Complaint ("SAC"). Dkt. 46 ("SAC").

On March 4, 2016, JP Morgan again moved to dismiss, Dkt. 51, and filed a memorandum of law in support. Dkt. 52 ("Def. Br."). On March 25, 2016, plaintiffs filed a memorandum of law in opposition. Dkt. 53 ("Pl. Br."). On April 8, 2016, JP Morgan filed a reply brief. Dkt. 54 ("Def. Reply Br."). On April 21, 2016, the Court heard argument. Dkt. 60 ("Tr.").

## B.  Plaintiffs' Core Factual Allegations[2]

Here, the Court summarizes plaintiffs' core allegations against JP Morgan—those which have remained unchanged between the Complaint and the SAC. After this discussion, the Court recaps its decision dismissing the initial Complaint, reviews the limited new factual allegations in the SAC, and then assesses whether, with those additions, the SAC states an antitrust claim.

In sum, plaintiffs allege that JP Morgan, in late 2010 and early 2011, *manipulated and dominated the "silver futures spread market and in particular the 'long-dated' silver futures spread market." See* Compl. ¶ 52; SAC ¶ 63. Plaintiffs allege two mechanisms by which JP Morgan manipulated the prices of silver futures spreads to its advantage. First, JP Morgan

---

[2] The Court assumes the facts alleged in the SAC to be true for the purpose of resolving the motion to dismiss. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

placed artificial, unrealistic bids on the trading floor, *see* Compl. ¶ 67; SAC ¶ 78; second, it made misrepresentations, tracking its own artificial bids, to the committee that sets settlement prices in this market, *see* Compl. ¶ 73; SAC ¶ 85.  Plaintiffs claim that JP Morgan's price manipulation made their positions unprofitable and untenable, and forced them to exit the market.  *See* Compl. ¶ 7; SAC ¶ 7.  Because this entailed paying JP Morgan (among others) a premium to take over their positions, plaintiffs claim, they suffered huge losses.  *See* Compl. ¶¶ 76–77; SAC ¶¶ 115–16.

### 1.     The Silver Futures Calendar Spread Market

Silver futures contracts are agreements to buy or sell fixed amounts of silver on a set future date.  Compl. ¶ 23; SAC ¶ 26.  They are traded on the Commodity Exchange, Inc. ("COMEX"), which provides standardized contracts with delivery dates ranging from the next calendar month to 60 months later.  Compl. ¶ 22; SAC ¶ 25.  The prices for "deferred" futures contracts—those with delivery dates beyond the nearest month—are determined by a variety of factors; in the absence of trading activity on which to base the prices, the COMEX "settlement committee" relies on "the spread bids/asks actively represented" in the marketplace, *i.e.*, the prices at which contracts are being offered.  Compl. ¶ 25; SAC ¶ 28.  Typically, the further off the delivery date, the higher the purchase price of futures contract for that date—a relationship called "contango."  Compl. ¶ 35; SAC ¶ 38.  The opposite relationship ("backwardation")— where nearer deliveries of the commodity cost more than ones further off—is "extremely rare" in this market.  Compl. ¶¶ 36–37; SAC ¶¶ 39–40.

A spread contract consists of alternating positions in two futures contracts.  Compl. ¶ 28; SAC ¶ 31.  In a "long" calendar spread, a party buys a futures contract in a particular month and sells a corresponding contract in a later month.  Compl. ¶ 28; SAC ¶ 31.  In a "short" calendar spread, a party sells a futures contract in a particular month and buys a corresponding contract in

a later month.  Compl. ¶ 28; SAC ¶ 31.  The spreads between silver futures contracts on a given

day indicate the "interest rate term structures of silver prices on that day."  Compl. ¶ 30; SAC

¶ 33.

### 2.   JP Morgan's Alleged Conduct

During the period at issue—late 2010 and early 2011—JP Morgan was one of only two

or three remaining market makers in the silver futures markets.  Compl. ¶ 49; SAC ¶ 60.  Thus,

the market for deferred silver futures calendar spreads "essentially consisted of JPMorgan on one

side and a small number of lower capitalized and very vulnerable locals and other independent

proprietary traders acting as market makers on the other."  Compl. ¶ 51; SAC ¶ 62.  Plaintiffs

were such traders.  *See* Compl. ¶ 51; SAC ¶ 62.  During this time, JP Morgan's silver trading

desk was controlled by Robert Gottlieb, who used various COMEX floor brokers to execute his

orders.  Compl. ¶ 55; SAC ¶ 66.

Plaintiffs allege that JP Morgan manipulated the silver futures spread market by taking

large long positions in nearby silver futures months against short positions in the deferred futures

months, Compl. ¶ 57; SAC ¶ 68, and then placing "large, uneconomic spread bids and offers . . .

just prior to the close," Compl. ¶ 67; SAC ¶ 78.  These spread orders, plaintiffs allege, influenced

the settlement prices that the settlement committee set as to deferred futures contracts.  Compl.

¶ 67; SAC ¶ 78.  This pushed the spreads toward rare "backwardation," benefitting JP Morgan's

position.  Compl. ¶ 67; SAC ¶ 78.  During the same period, Gottlieb also allegedly caused certain

brokers to "harangue" COMEX employees, by pointing to JP Morgan's own uneconomic bids

and offers, so as to obtain JP Morgan's desired settlement prices.  Compl. ¶ 73; SAC ¶ 85.

This allegedly artificial price movement put pressure on plaintiffs' positions, which they

were ultimately forced to liquidate.  Compl. ¶¶ 76–77; SAC ¶¶ 115–16.  On January 24, 2011, JP

Morgan took over some of Shak's silver spread positions, while a hedge fund with "significant

links" to JP Morgan, Wolverine Asset Management LLC, took most.  Compl. ¶¶ 78–80; SAC ¶¶ 117–19.  Plaintiffs Wacker and Grumet similarly allege that, when they were forced to liquidate over the next few weeks, JP Morgan was "clearly the counterparty."  Wacker Dkt. 41, ¶ 119; Grumet Dkt. 40, ¶ 119.

Plaintiffs articulate several reasons to infer that JP Morgan engaged in such conduct.

First, they allege, JP Morgan had an economic motive to manipulate the silver spreads market.  They allege, for instance, that manipulating the spreads benefitted JP Morgan "in the context of physical transactions" with silver producers, "which were based on COMEX silver futures price settlements."  Compl. ¶ 98; SAC ¶ 140.

Second, plaintiffs allege, "open interest" (the total number of futures in a delivery month that have not been offset or fulfilled by delivery) and "volume" (the number of contracts in futures transacted during a specific period) evidence JP Morgan's manipulation.  *See* Compl. ¶¶ 31–32; SAC ¶¶ 34–35.  Plaintiffs allege that "JP Morgan's market power is demonstrated by the high percentage of open interest it comprised in the deferred spreads" and "by the percentage of total volume JP Morgan's [sic] commanded on particular trading days."  Compl. ¶ 58; SAC ¶ 69.  For instance, on certain dates when Wacker and Grumet sold their positions to JP Morgan, those trades accounted for 19%, 94%, 84%, and 70% of the daily volume, and the open interest in the particular calendar spreads was reduced by roughly the amount of the trades; this shows, plaintiffs claim, that JP Morgan was the counterparty.  Compl. ¶¶ 60–61; SAC ¶¶ 71–72; *see also* Compl. ¶ 80; SAC ¶ 119 (as to Shak liquidation).

Third, plaintiffs allege, there was, during the period of alleged manipulation, systematic and anomalous divergence between the silver futures spreads market and the over-the-counter (OTC) silver market, whereas, without manipulation, these markets should roughly track each

other.  *See* Compl. ¶¶ 102–18; SAC ¶¶ 151–67.  The silver OTC market "consists generally of bi-lateral contracts between parties for various sorts of silvers swaps and other derivatives." Compl. ¶ 38; SAC ¶ 41.  The Silver Indicative Forward Mid Rates ("SIFO") was, during the relevant time period, a "reliable benchmark" representing conditions in the OTC market.  Compl. ¶ 44; SAC ¶ 46.  Before January 2011, plaintiffs allege based on an expert consultant's analysis, SIFO and the silver futures spreads "were close to each other."  Compl. ¶ 110; SAC ¶ 159. However, a "significant divergence" occurred between January and May 2011; this, plaintiffs allege, is "potentially a sign of silver futures settlements being manipulated throughout the period."  Compl. ¶ 110; SAC ¶ 159.  Specifically, during this time period, silver futures spreads diverged from SIFO by an average of "10 to 15 cents."  Compl. ¶ 131; SAC ¶ 180.  Because they converged again in May 2011, plaintiffs' expert concluded, the divergence was not "due to a fundamental structural change in the silver market."  Compl. ¶ 129; SAC ¶ 178.  And because the divergence lasted several months, the expert concluded, it was not due to the arrival of new information, which the market would have quickly absorbed.[3]  Compl. ¶ 130; SAC ¶ 179.

SIFO is determined every day based on the submissions of a contributing panel of banks, including JP Morgan.  *See* Compl. ¶ 41; SAC ¶ 43.  Plaintiffs' expert reviewed JP Morgan's SIFO submissions during the relevant period and found that, although they were in line with futures spreads before January 2011, at that point there was "a clear divergence between silver futures spreads and JP Morgan's SIFO submissions."  Compl. ¶ 189; SAC ¶ 238.  Plaintiffs allege that this explains "why futures spreads entered backwardation to such an extent while SIFO did not."  Compl. ¶ 196; SAC ¶ 245.

---

[3] Plaintiffs allege several other expert analyses in support of these conclusions.  *See* Compl. ¶¶ 132–85; SAC ¶¶ 181–234.

### C.    Bases for the Dismissal of Plaintiffs' Antitrust Claims as Originally Pled

To state a claim for monopolization under § 2 of the Sherman Act and § 4 of the Clayton Act, plaintiffs must allege two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *PepsiCo, Inc. v. Coca–Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)) (internal quotation marks omitted).  Plaintiffs must also plead an *antitrust* injury—*i.e.*, an injury "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)) (internal quotation marks omitted).

The Court's analysis in dismissing plaintiffs' monopolization claim as initially pled was that while the Complaint adequately alleged that JP Morgan possessed monopoly power in the silver futures spreads market, *see Shak*, 2016 WL 154119, at *14–16, it did not adequately plead willful acquisition or maintenance of monopoly power, or, in other words, "anticompetitive *conduct*." *Id.* at *16 (quoting *Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004)) (emphasis in original).  As a result, the Court noted, while the manipulative practices the Complaint described might have pled a cognizable CEA claim had plaintiffs sued within the shorter limitations period governing CEA claims, *see Shak*, 2016 WL 154119, at *10, they did not make out a violation of the antitrust laws.

Specifically, the Court held, the Complaint's pleadings as to the element of willful acquisition or maintenance of monopoly power were inadequate for two independent reasons.

First, the conduct the Complaint alleged on JP Morgan's part was "pled in unacceptably vague terms"—the Complaint lacked crucial details, including "dates, names, amounts, and prices," about JP Morgan's ostensibly "uneconomic" bidding behavior and its misrepresentations to the COMEX settlement committee. *Shak*, 2016 WL 154119, at *16, *18.

Second, and more fundamentally, the Complaint, while chronicling manipulative actions, "fail[ed] to connect this [alleged] conduct to a scheme to willfully acquire or maintain monopoly power." *Id.* at *18. The Complaint "simply conclude[d] . . . that JP Morgan's bids and offers were 'uneconomic,' and declare[d], *ipse dixit*, there 'was no legitimate justification' for reporting significantly more tightness in the spreads market than in the over-the-counter markets." *Id.* (quoting Compl. ¶¶ 67, 69) (citations omitted). In light of these gaps, the Complaint failed to make "concrete allegations plausibly suggesting uneconomic behavior intended to acquire or maintain monopoly power, or satisfactorily distinguish[ing] JP Morgan's conduct from that of a rational, hard-nosed market actor." *Id.* at *19.[4]

The Court separately noted that its holding that the Complaint inadequately pled willful acquisition or maintenance of monopoly power "appear[ed] to compel the conclusion that [plaintiffs] have failed to allege antitrust injury as well," but had no occasion to resolve that issue definitively. *Id.*

---

[4] Largely on the basis of these deficiencies, the Court dismissed plaintiffs' other antitrust claims, including for attempted monopolization and for violating New York's antitrust statute, which mirrors federal law. *See Shak*, 2016 WL 154119, at *19 n.16. Separately, the claim of conspiracy to monopolize failed because the Complaint did not even "allege an agreement." *Id.* at *20.

### D.        Factual Allegations Added by the SAC

The SAC's new allegations reframe and modestly elaborate on the mechanics of the scheme as originally alleged.[5]  The SAC makes two categories of changes to the initial Complaint.

Most significant, plaintiffs reframe their antitrust claim as involving "predatory bidding." Specifically, the SAC alleges that JP Morgan "bid up the cost of silver futures calendar spreads far beyond the legitimate price of its economic outputs, widely recognized to be the sum of the expected value of the underlying silver bullion plus carrying expenses and interest of the near and far leg of the spread."  SAC ¶ 10.  This "overbidding" would have been economically irrational, *see id.* ¶¶ 10, 13, except that the "unnatural rise in price of silver calendar spreads made it impossible for other market participants [*e.g.*, plaintiffs] to continue trading."  *Id.* ¶ 10. "The capitulation of these traders allowed JP Morgan to recoup its overbidding losses by unwinding its positions at an unnatural premium."  *Id.*  As other traders left the market, JP Morgan's ability to manipulate the spreads grew, cementing its monopoly power.  *See id.* ¶¶ 6–7.

Second, the SAC attempts to elaborate on JP Morgan's alleged manipulation of the COMEX settlement committee.  *See Shak*, 2016 WL 154119, at *18 (noting that allegations in initial Complaint on this point "lack[ed] specifics").  The SAC alleges that, "on at least fourteen dates in February, 2011," JP Morgan's representative Gottlieb "pressured" a COMEX representative "to settle at the price that JP Morgan dictated."  *Id.* ¶ 87.[6]  These prices reflected much greater backwardation than the prevailing SIFO rate implied.  *See id.* ¶ 103.  JP Morgan's representations also did not reflect "where the market had been trading the entire day" and were

---

[5] *See generally* Dkt. 59, Ex. A (redline comparison of Shak Complaint and SAC).

[6] The SAC alleges substantively identical facts as to each of these 14 dates.  *See* SAC ¶¶ 89–102.

not "consistent with the midpoint of bid-ask at the close." *Id.* ¶¶ 89–102.  The SAC alleges that this conduct "violated the settlement procedures," presumably referring to internal COMEX procedures, "because there had been no trading activity and the settlements was [sic] not determined using the spread bids/asks actively represented in the futures markets" or other "available market information." *Id.*

In sum, the SAC alleges, JP Morgan's conduct was exclusionary or anticompetitive, and helped JP Morgan acquire or maintain its monopoly power, because the artificial backwardation it created forced plaintiffs to abandon their increasingly tenuous and unprofitable positions and to exit the market entirely. *See id.* ¶¶ 111–14.  The SAC alleges that JP Morgan's behavior would be "irrational if not for anticompetitive intent." *Id.* ¶ 105.  "There was no legitimate economic justification," the SAC alleges, "to argue for higher levels of backwardation in the COMEX futures market and, at the same time, make SIFO submissions" reflecting much less or no backwardation. *Id.* ¶ 81.  JP Morgan's motive to do this was instead to prevent the spreads from moving back toward the "historical norm of contango," which would have made plaintiffs' positions profitable. *Id.* ¶ 110; *see also id.* ¶ 145 ("[H]ad [plaintiffs] not been forced out of the market, they could have held their spread positions in opposition to JP Morgan through to expiration.  At this point they would have made millions in gains at the expense of JP Morgan.").  By using artificial bidding and manipulating the COMEX settlement committee to prevent a reversion to contango, JP Morgan forced plaintiffs, its counterparties, to "capitulate" and exit the market. *Id.* ¶ 111.

## II.     The Motion to Dismiss

The Court now considers whether the SAC's added allegations remedy the pleading deficiencies in the initial Complaint.

### A.      Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

In considering a motion to dismiss, a district court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010)) (internal quotation marks omitted).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  "[R]ather, the complaint's *factual* allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 570) (internal quotation marks omitted) (emphasis in *Arista Records*).

### B.      New Framework: Predatory Bidding

The parties spar at length over whether the predatory-bidding framework that the SAC attempts to introduce is even applicable in the context of a futures market.

A claim of predatory bidding typically arises where a defendant that manufactures an "output" bids up the price of an "input," so as to drive other buyers of the input out of business.

12

Once it has secured this "buyer's monopoly" or "monopsony power," the defendant can recoup the losses it incurred through overbidding on inputs by reaping monopoly profits in the output market.  *See Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320–22 (2007).  The predatory-bidder monopolist thus "suffer[s] losses today on the chance that it will reap supracompetitive profits in the future."  *Id.* at 323.  The Supreme Court has held that a predatory-bidding plaintiff must establish that (1) "the alleged predatory bidding led to below-cost pricing of the predator's outputs," *i.e.*, that the defendant's overbidding on inputs "caused the cost of the relevant output to rise above the revenues generated in the sale of those outputs," and (2) "the defendant has a dangerous probability of recouping the losses incurred in bidding up input prices through the exercise of monopsony power."  *Id.* at 325.

At the outset, plaintiffs' attempt to invoke the predatory-bidding framework runs into the problem of defining the relevant inputs and outputs.  In *Weyerhaeuser*, logs were the input, and the output was finished hardwood lumber.  *Id.* at 316.  But in the context of a futures market, defining inputs and outputs is more difficult, if not impossible.[7]  *See In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 906 (N.D. Ill. 2011) (in case involving allegations that defendants purchased cheese at an inflated price expecting that profits from sale of milk futures contracts would cover any losses, court noted that "milk futures" and "cheese" are "not easily defined as inputs or outputs").  In a case that the Court prominently addressed in its January 12 Decision, Judge Carter of this District held that *Weyerhaeuser*'s predatory-bidding framework was "not applicable" to allegations that defendants artificially inflated prices in the

---

[7] Plaintiffs argue that predatory-bidding claims have been successfully pled in the "finance" context, *see* Pl. Br. 9–10, but the sole case they cite does not permit such a sweeping conclusion. *See U.S. Futures Exch., L.L.C. v. Bd. of Trade of City of Chi., Inc.*, No. 04 Civ. 6756, 2010 WL 2679982, at *1 (N.D. Ill. July 2, 2010) (allegations that futures exchange reduced its fees below cost after competitor announced intent to launch rival exchange).

cotton futures market. *In re Term Commodities Cotton Futures Litig.*, No. 12 Civ. 5126 (ALC), 2014 WL 5014235, at *10 (S.D.N.Y. Sept. 30, 2014) ("*Cotton II*"). As to other points, plaintiffs rely heavily on *Cotton*, *see, e.g.*, Tr. 39 ("I think *Cotton* is a great case for us."), but on the issue of the applicability of the predatory-bidding framework, they try to distinguish it on the ground that neither Judge Carter nor the plaintiff "identified any possible output for cotton futures." Pl. Br. 11. Here, plaintiffs point out, the SAC alleges that the "outputs" of the silver futures spreads are "the expected value of the underlying silver bullion plus carrying expenses and interest of the near and far leg of the spread." *Id.* (quoting SAC ¶ 10). But simply *naming* an alleged "output" does not make the definition plausible.

The Court has considerable skepticism that the *Weyerhaeuser* framework, developed as it was in the context of cases involving manufacturing industries, logically makes sense in the context of a futures market—what is essentially a betting market. But ultimately the Court need not reach that conceptual issue, because, whether or not the *Weyerhaeuser* framework applied, the SAC's factual pleadings would still be obliged to clear a similar threshold.[8] To plead willful acquisition or maintenance of monopoly power, the SAC would still be required to adequately allege that JP Morgan "deliberate[ly] us[ed] unilateral pricing measures for anticompetitive purposes and incurr[ed] short-term losses in order to reap supracompetitive profits in the future." *In re Term Commodities Cotton Futures Litig.*, No. 12 Civ. 5126 (ALC), 2013 WL 9815198, at *26 (S.D.N.Y. Dec. 20, 2013) ("*Cotton I*") (citing *Weyerhaeuser*, 549 U.S. at 322); *see also Dairy Farmers*, 767 F. Supp. 2d at 906 (same); *see also* Pl. Br. 13 (identifying this as a "more general principle" applicable outside the manufacturing context); *New York ex rel. Schneiderman*

---

[8] Indeed, in both *Cotton* and *Dairy Farmers*, *Weyerhaeuser* was invoked by the *defendants* because it appears to be a more demanding threshold for antitrust plaintiffs.

*v. Actavis PLC*, 787 F.3d 638, 659 (2d Cir. 2015) ("[W]illingness to forsake short-term profits to achieve an anticompetitive end is indicative of anticompetitive behavior.") (internal quotation marks omitted).

In the January 12 Decision, the Court applied that standard to the initial Complaint, and compared and contrasted plaintiffs' allegations to those in *Cotton* and another recent case from this District arising in the context of a futures market, *In re Crude Oil Commodity Futures Litigation*, 913 F. Supp. 2d 41 (S.D.N.Y. 2012). *See Shak*, 2016 WL 154119, at *18 (noting that in those cases, the plaintiffs alleged that "defendants were taking short-term, separate losses . . . in order to reap far larger gains by virtue of their dominant positions in certain futures contracts"). The Court held that the initial Complaint failed to adequately allege either (1) sufficient details about JP Morgan's conduct, *e.g.*, "dates, names, amounts, and prices," and, ultimately, (2) that JP Morgan's conduct was uneconomic, irrational (assuming no monopolistic intent), and without legitimate justification. *Id.*

The Court, therefore, proceeds to examine whether the SAC's new *factual* allegations, as opposed to its new conceptual framework, cure these deficiencies.

### C.     Assessment of the SAC's New Factual Allegations

#### 1.     *Allegations Regarding Manipulation of the Settlement Committee*

The SAC's allegations about the COMEX settlement committee—replicated verbatim 14 times—are self-contradictory. Each time, the SAC alleges that JP Morgan's representations to COMEX did not reflect "where the market had been trading the entire day," while also stating that, in fact, "there had been no trading activity" that day. *Id.* ¶¶ 89–102. The SAC's allegations are also conclusory: It alleges generally that JP Morgan's representations were inconsistent with the bids/asks being "actively represented" in the market on the days in question, but it does not concretely recite what those bids/asks were. Instead, it alleges generally that JP Morgan's

15

representations were instead "*based on* JP Morgan's uneconomic, artificially tight bids and offers for calendar spreads that were introduced to the market just before the close." *Id.* ¶ 85 (emphasis added).  The SAC does not concretely allege the amounts of these artificially tight bids and offers, either.

In their brief opposing dismissal, plaintiffs shift course.  They clarify that their theory of manipulation is based instead on the allegation that JP Morgan's representations diverged from SIFO.  On each of the 14 dates, plaintiffs state, "the prices submitted by JP Morgan to the COMEX committee differed greatly from the prevailing SIFO rate reported by JP Morgan," and, plaintiffs argue, this conduct could have had no non-exclusionary purpose because "SIFO and the deferred spreads at issue should track one another."  Pl. Br. 17.  In so arguing, plaintiffs rely on facts pled in the initial Complaint and reprised in the SAC.  *See* Compl. ¶¶ 102–85 (statistical analyses to the effect that SIFO and futures spread prices should track one another); *id.* ¶ 186–96 (alleging that JP Morgan's SIFO submissions diverged sharply from futures spread prices in early 2011); *id.* ¶ 69 (alleging that JP Morgan's SIFO submissions reflected much less "tightness" than its other conduct would suggest).

The SAC, however, does nothing to cure the problem that the Court identified with the initial Complaint: its unsubstantiated "*ipse dixit*" that JP Morgan's price representations were uneconomic and that there was "no legitimate justification" for this allegedly contradictory behavior.  *Shak*, 2016 WL 154119, at *18 (quoting Compl. ¶ 69); *see also id.* (holding that while allegations of "contradictory SIFO submissions are not inconsistent with a scheme to acquire or maintain monopoly power," "they do not go beyond that to affirmatively plead the existence of such a scheme or to differentiate it in likelihood from conduct permissible under [the Sherman Act]") (citation omitted).  Merely alleging that SIFO and the silver futures spreads usually

16

"track" each another, *see* Pl. Br. 17–19, does not suffice to allege that no rational competitor could have believed, at a particular point in time, that they *should* not track one another.

Moreover, there are strong reasons to doubt that SIFO is the proper benchmark for long-dated silver futures spreads.  As JP Morgan explains, SIFO "indicates expectations for [silver] OTC forward prices up to just one year in the future," whereas the long-dated silver futures spreads at issue in this case reflected expectations three years in the future.  Def. Br. 16 (citing SAC ¶¶ 44, 68, 171–72); *see also* SAC ¶¶ 86–102 (focusing exclusively on the spread for December 2012–December 2014).  The SAC does not plausibly explain why expectations with respect to silver prices could not yield divergent outcomes as to different future dates.  Plaintiffs' supposition that there is ineluctably a predictable relationship between forward prices on distinct dates does not logically follow, and notably ignores the possibility of date-specific variables that could account for such divergences.  Plaintiffs' supposition that SIFO must supply *the* measure of appropriate prices for long-dated silver spreads, such that price quotes that diverge from it must be viewed with suspicion and as badges of a monopolist's manipulative activity, is implausible, absent concrete pleadings substantiating such claims.  *See* Def. Reply Br. 9; *id.* at 3 ("Uncertainty regarding the future price of commodities is the driving mechanism underlying all futures markets.") (citing SAC ¶ 31).[9]

---

[9] The SAC does claim that SIFO and silver futures spreads should ordinarily track each other because of arbitrage.  *See* SAC ¶ 166 ("[A]ny gap between [silver futures spreads and SIFO] should be filled by the market through arbitrage."); Pl. Br. 18 n.15.  But the SAC also alleges that arbitrage was "not readily possible" in early 2011, for which it does not blame JP Morgan. SAC ¶ 166.  At argument, plaintiffs attempted to explain that the "dislocation" in the market was so short-lived that arbitrageurs could not fill the gap.  Tr. 31.  But that factual allegation was not in the SAC, which controls here.  *See id.* at 47 ("[W]e did adequately allege the arbitrage was not easy or not possible. . . .  [W]e *mean* it is not possible *at that moment*.") (emphasis added); *cf. Fonte v. Bd. of Managers of Cont'l Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988) ("Factual allegations contained in legal briefs or memoranda are also treated as matters outside the pleading for purposes of Rule 12(b).").

The SAC, tellingly, alleges that SIFO is useful as a benchmark for long-dated silver futures spreads, because, given the "lack of observability and liquidity" in that market, "there is no better alternative."  SAC ¶ 56; *see also* Pl. Br. 18 (SIFO is "the best" available benchmark). But identifying SIFO as the best available benchmark falls far short of adequately pleading that it supplies the acid test of rational pricing, such that divergent price quotes by a market participant like J.P. Morgan would give rise to an inference of irrational or uneconomic pricing by the quoting party so as to support a plausible claim of anticompetitive conduct.  Indeed, as the SAC itself alleges, apart from the early-2011 period at issue, there have been significant periods when SIFO and silver futures spreads have diverged, and the SAC does not suggest that these divergences reflected a monopolist's manipulation or other pricing impropriety.  *See* Def. Br. 17 (citing SAC ¶¶ 57, 107–08).

Plaintiffs argue that such a "quibble with SIFO" presents a "fact issue that will require expert analysis."  Pl. Br. 19.  But where a claim of anticompetitive conduct turns on the legitimacy *vel non* of an alleged monopolist's pricing, the plausibility of the alleged benchmark as a gauge of good-faith pricing must be, and has been, assessed at the motion-to-dismiss stage. *See, e.g., In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*, No. 11 MD 2213 (RPP), 2012 WL 6700236, at *13 (S.D.N.Y. Dec. 21, 2012) (faulting plaintiffs for not "explaining why COMEX silver futures prices should be compared solely to the benchmark of gold prices") (internal quotation marks omitted).  Given the SAC's failure both to *explain* why SIFO should track silver futures spreads, and to concretely plead that it did so consistently, a mere general correlation between these two is not sufficient to make SIFO a reliable benchmark such that deviations from it support a claim of irrational pricing animated by anticompetitive aims.

The SAC ultimately alleges that, in early 2011, the *only* rational price for long-dated silver futures spreads was dictated by SIFO, so as to treat any divergent bid or ask by JP Morgan as anticompetitive. *See* SAC ¶ 10 (referring to this as the "legitimate price"); Tr. 38 (arguing that "the rational actor would take [plaintiffs'] position as well"). But, without a more substantial benchmark-type relationship than is alleged here, that allegation is implausible. In contrast, in predatory-bidding cases, plaintiffs that have stated claims have done so by pleading *concretely* that the defendant had engaged in below-cost pricing of the relevant output. As the Supreme Court has explained, in such cases "higher bidding that does not result in below-cost output pricing is beyond the practical ability of a judicial tribunal to control without courting intolerable risks of chilling legitimate procompetitive conduct." *Weyerhaeuser*, 549 U.S. at 325 (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993)) (internal quotation marks omitted). Similarly, in *Crude Oil* and *Cotton*, as this Court previously noted in distinguishing those cases, "the uneconomic nature of defendants' conduct was far more patent" than here. *Shak*, 2016 WL 154119, at *18. The *Crude Oil* Complaint alleged with specificity that the defendant had amassed an unneeded, massive quantity of crude oil, in order to fool the market into perceiving scarcity, ultimately to the benefit of defendants' calendar spread positions. *See id.* at *17. And the *Cotton* Complaint alleged that the defendants had insisted on delivery on their cotton futures contracts even though their need for cotton could have been much more cheaply satisfied in the cash markets. *See id.* The defendants' losses in those cases, and the irrationality of their conduct except as a means to obtain or maintain dominance in the market, were concrete and plausible in a way that, as pled, JP Morgan's alleged "overbidding" on silver futures spreads during a brief window in 2011 is not. SAC ¶ 10.

2.     *Allegations Regarding JP Morgan's Motive*

The SAC also adds allegations relating to JP Morgan's motive for manipulating the silver futures spreads market.  The Complaint had alleged that "one of JP Morgan's primary possible motives for manipulating the spreads to artificial levels was to benefit itself in the context of physical transactions with its silver counterparties, which were based on COMEX silver futures price settlements."  Compl. ¶ 98.  The SAC elaborates on these "physical transactions"—they were, it alleges, "hedging" transactions in which metals trading desks at banks like JP Morgan contracted to purchase silver from producers at pre-determined future dates, the price determined by reference to a benchmark like the COMEX settlement price.  SAC ¶ 136.  By "passing along" the "artificially depressed" COMEX settlement price to counterparties, the SAC alleges, JP Morgan could make these transactions "highly profitable."  *Id.* ¶ 139; *see also id.* ¶ 11.

This additional background, however, does not cure the SAC's deficiencies.

The SAC's factual allegations as to JP Morgan's physical silver transactions are conclusory.  The SAC lacks allegations about when these transactions occurred, the identity of JP Morgan's counterparties, or the amount of the alleged outsized profit that JP Morgan reaped.  The sole allegation that has a degree of particularity is that, on or about February 5, 2011, plaintiff Grumet "was informed" by his broker that the broker had heard from *other* brokers that Gottlieb was passing along the COMEX settlement price to a "customer."  *Id.* ¶ 139.  However, the SAC does not plead that there is anything wrongful or inherently indicative of illegality about such a communication.  To the contrary, the SAC pleads that it was *common* to use the COMEX settlement prices as a benchmark in these physical hedging transactions; indeed, it alleges that Grumet "drafted many [such] agreements" in his early career.  *Id.* ¶ 137; *see also id.* ¶ 11 (hedging contracts are "commonly priced by reference to COMEX silver spread prices").  Without more, the double hearsay to the effect that Gottlieb in early 2011 communicated a

COMEX settlement price to a customer—even if taken as true—therefore would not evidence artificial or irrational pricing behavior.

***

For these reasons, the new allegations in the SAC—which largely reframe and elaborate upon existing allegations in the dismissed Complaint—do not adequately plead exclusionary or anticompetitive conduct, *i.e.*, willful acquisition or maintenance of monopoly power.[10]

### D.     Antitrust Injury

In light of the holding above, the Court again has no occasion to resolve whether the SAC adequately pleads antitrust injury.

**CONCLUSION**

The Court grants JP Morgan's motions to dismiss.  Because the Court previously granted leave to amend, and plaintiffs again failed to state a claim, this dismissal is with prejudice.

The Clerk of Court is respectfully directed to close the motions pending at docket number 51 in 15 Civ. 992; docket number 46 in 15 Civ. 994; and docket number 45 in 15 Civ. 995, and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: June 29, 2016
       New York, New York

---

[10] The SAC did not make any substantive changes to the Complaint's inadequate allegations regarding JP Morgan's refusal to provide spread quotes, and therefore this theory of exclusionary conduct also fails. *See Shak*, 2016 WL 154119, at *18–19.  The SAC also does not add allegations relevant to plaintiffs' claims of attempted monopolization and conspiracy to monopolize. *See id.* at *19 n.16 (dismissing attempted monopolization claim); *20 (dismissing conspiracy claim).