# KIRBY McINERNEY LLP

825 Third Avenue
New York, NY 10022
212.371.6000
Fax. 212.699.1194
www.kmllp.com

Of counsel
   Roger W. Kirby
   Alice McInerney

December 1, 2017

**VIA ECF**
The Honorable Paul A. Engelmayer
United States District Judge
United States Courthouse
40 Foley Square
New York, New York 10007

      Re:   *Shak et al. v. JP Morgan Chase & Co., et al.*, 15 Civ. 00992;
              *Wacker v. JP Morgan Chase & Co., et al.,* 15 Civ. 00994;
              *Grumet v. JP Morgan Chase & Co., et al.,* 15 Civ. 00995

Dear Judge Engelmayer:

      We write respectfully in response to Defendants' November 28, 2017 letter ("Def. Ltr."), which – on the eve of the expiration of fact discovery – raises two long standing discovery disputes for which the parties have been *at an impasse for months*. As discussed below, Defendants' motion to compel – which concerns the production of Plaintiffs' consulting expert's work product and information concerning virtually every asset Plaintiffs' own – should be denied.

**I.    Defendants, at Most, Are Entitled to the Consulting Expert's Written Analyses Plaintiffs Specifically Relied Upon in Drafting the Complaints and Nothing More**

      Defendants first seek to compel production of "the analyses of created by Plaintiffs' consulting expert and referenced in the" Second Amended Complaints ("SACs"), including "any reports reflecting those analyses *and the data, and calculations and programs necessary to recreate those analyses*." Def. Ltr. at 2 (emphasis added). As the Court may recall, those analyses pertained to the utility of the Silver Indicative Forward Mid Rates ("SIFO") as a pricing benchmark.

      Although Plaintiffs believe that they are not obligated to produce any of their consulting expert's analyses, *see* Fed. R. Civ. P. 26(b)(4)(D), in an effort to partially alleviate the need for the Court's intervention on this issue, Plaintiffs are willing to produce the written reports/findings that were expressly relied upon in drafting the portions of the SACs dealing with SIFO's utility as a benchmark. However, as discussed below, Plaintiffs object to the remainder of Defendants' request because, *inter alia*, Plaintiffs are precluded from sharing the underlying data pursuant to licensing agreements, *and Defendants already agreed to forgo production of that information.*

      *First*, as Plaintiffs have repeatedly informed Defendants, Plaintiffs' consulting expert no longer has access to a large swathe of the underlying data. Rather, the consulting expert was able to access such data only for a limited time, pursuant to licensing agreements with Bloomberg and Thomson Reuters. And more critically, regardless of whether Plaintiffs' consulting expert

Hon. Paul A. Engelmayer                                                                                              Page 2

continues to have access to any of the underlying data, the licensing agreements broadly preclude dissemination to third-parties. *See* Exhibit A at ¶ 4 (Bloomberg Agreement); Exhibit B at ¶¶ 3, 6 (Thomson Reuters Agreement).

*Second*, to assist Defendants, Plaintiffs already provided them with a detailed chart identifying the precise data relied upon by the consulting expert, as well as its source and "ticker" symbol, so that Defendants could independently obtain that data from Bloomberg and Reuters. *See* Ex. C (July 24, 2017 Email from Andrew McNeela to Akash Toprani, and Attachment).

*Third*, in light of the forgoing, Defendants agreed that they were no longer seeking production of the data underlying the consulting expert's report. *See* Exhibit D (September 19, 2017 email from Akash Toprani to Karen Lerner, at Points 1 & 2). In fact, Defendants conceded that they already had access to the Bloomberg data, and agreed that "there was no issue" with respect to the Thomson Reuters' data. *See id.*

*Fourth*, Defendants' primary authority – Judge Sweet's decision in *Financial Guaranty Insurance Company v. The Putnam Advisory Group, LLC*, 314 F.R.D. 85 (S.D.N.Y. 2016) ("*Putnam*") – undermines their position. Specifically, there the court held that the defendants' request was impermissibly overbroad, and that the "at issue" waiver only required the plaintiff to produce the specific report relied on in the complaint. *See id.* at 90. So too here, Defendants' demand for underlying data and programs utilized by the consulting expert – in addition to the reports generated by the consulting expert – is precluded by *Putnam*.

*Finally*, although Defendants stated that they intended to move to compel *over two months ago* on September 19, 2017, *see* Exhibit D (September 19, 2017 email from Akash Toprani to Karen Lerner, at Point 3), they sat on their hands until the twilight of fact discovery, and only sought the Court's intervention after they vociferously opposed Plaintiffs' recent request for an extension of the fact discovery period. Defendants cannot have it both ways, and should not be permitted to sandbag Plaintiffs at the last minute.

Accordingly, Plaintiffs should not be required to produce any materials beyond the written analyses/reports they utilized in drafting the the SACs.

**II.    The Court Should Deny Defendants' Exceedingly Belated and Remarkably Overbroad Motion for Irrelevant Discovery Related to "Plaintiffs' Assets"**

Defendants next seek to compel documents related to *all* of Plaintiffs' assets with a value exceeding $1,000. Defendants' motion should be denied in its entirety for the following three reasons.

*First*, Defendants' motion is exceedingly belated and prejudicial. Defendants were aware of Plaintiffs' position *no later than July 19, 2017*, *see* Def. Ltr. at 3 (quoting Plaintiffs' July 19, 2017 Ltr.), and have not broached the topic of asset-related information *for several months*. Indeed, that Defendants did not seek to compel the production of such information until the very end of fact discovery – while Plaintiffs are in the middle of preparing for, *inter alia*, their depositions – raises the strong inference that Defendants are more interested in obtaining a

Hon. Paul A. Engelmayer	Page 3

litigation advantage than the documents themselves.  In any event, even assuming good faith, Defendants' motion is still inexcusably late and prejudicial to Plaintiffs, given its remarkable breadth.

*Second*, Defendants' request is so broad it would make an IRS auditor blush.  Without hyperbole, Defendants' request – *even if limited to assets above $1,000 in value* – would include documents related to: art work; wrist watches; jewelry; golf club sets and other sporting equipment; rare collectibles (such as stamp and coin collections, comic books, baseball cards and other memorabilia); furniture and appliances; office furnishings; computers and other electronic equipment; musical instruments (from pianos to *Gibson* guitars); vintage wines and spirits; suits, shoes, top coats, and various other clothing items; all motor vehicles; all real property; and virtually all financial accounts, including regular savings/checking accounts, retirement funds including IRAs and 401(k) accounts, stock funds, and Section 529 plans, *etc.*  And while Defendants balked at Plaintiffs' July 2017 proposal to limit Plaintiffs' production to liquid assets that Plaintiffs used or would have used in connection with their silver trading activities, Defendants *to date* have failed to offer a single counterproposal that would meaningfully circumscribe their request.

To be clear, however, Plaintiffs no longer offer that compromise due to the prejudice and burden they would suffer having to respond to even a narrowed request, given that only a handful of days remain before the close of fact discovery.  Rather, to the extent Plaintiffs are required to produce any asset-related information – and they should not be – it should go no further than Plaintiffs' IRS Form 1099s for 2010 and 2011.

*Third*, Defendants' purported need for asset-related information is remarkably anemic and far outweighed by the burden of production.  Defendants' central premise is that if Plaintiffs were capable of, for example, selling a boat or using it as collateral for a loan in order raise cash sufficient to meet margin requirements, they have not suffered antitrust injury.  But Defendants do not cite *a single case* holding that a plaintiff is required to remain in and suffer ever mounting losses in an actively manipulated market, in order to have redress under the antitrust laws.  The utter lack of support for Defendants' position is unsurprising considering that it would require a plaintiff in a price manipulation case to go bankrupt or prove that he or she would have gone bankrupt prior to having antitrust standing.  But that is plainly absurd.  Perhaps Plaintiffs here could have relied on the generosity of a rich relative and obtained a loan to meet their margin calls (a line of reasoning which itself presupposes that the Plaintiff could divine the future and see that Defendants' price manipulation would be temporary thus justifying the loan in the first place) – but the law simply does not require such proof as a prerequisite to establishing antitrust injury.  And even if that were the law, which it is not, the burden and expense of Defendants' overbroad request far outweigh its likely benefit.  *See* Fed. R. App. P. 26(b)(1).

Accordingly, Defendants' motion to compel the production of asset related documents pursuant to request No. 28 should be denied in its entirety, or limited solely to IRS Form 1099s.

                Respectfully submitted,

                 /s/ Andrew M. McNeela
cc:  All Counsel of Record (via ECF)   Andrew M. McNeela